RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0041p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

KENNETH J. JACKSON, JR. (17-3896); ANTOWINE PALMER (17-3902),

*Defendants-Appellants*.

Nos. 17-3896/3902

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:15-cr-00453-1—Patricia A. Gaughan, District Judge.

Argued: July 26, 2018

Decided and Filed: March 12, 2019

Before: WHITE, DONALD, and LARSEN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Kevin M. Cafferkey, Cleveland, Ohio, for Appellant in 17-3896. Jaime P. Serrat, JAIME P. SERRAT LLC, Cleveland, Ohio, for Appellant in 17-3902. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kevin M. Cafferkey, Cleveland, Ohio, for Appellant in 17-3896. Jaime P. Serrat, JAIME P. SERRAT LLC, Cleveland, Ohio, for Appellant in 17-3902. Matthew B. Kall, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.

A jury convicted Kenneth Jackson, Jr. of three counts of carjacking and three counts of using, carrying, or possessing a firearm during a crime of violence, and Antowine Palmer of one count of carjacking and one count of using, carrying, or possessing a firearm during a crime of violence. In this consolidated appeal, defendants challenge their convictions and aspects of their sentences. We vacate one of Jackson's firearms convictions and remand for resentencing. We affirm in all other respects.

## I. Background

### A. Pre-Trial Proceedings

#### 1. Indictment and Guilty Pleas

In December 2015, Jackson, Palmer, Tervon'tae Taylor, D'Wan Dillard, Jr., and Calvin Rembert were charged with multiple violations of 18 U.S.C. § 2119(2)—carjacking resulting in serious bodily injury—and 18 U.S.C. § 924(c)(1)(A)(ii)—using, carrying, or possessing a firearm during a crime of violence. Palmer was also charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

In August 2016, Rembert and Taylor both entered guilty pleas pursuant to agreements with the government.[1] Rembert's and Taylor's plea agreements required that they cooperate with the government and testify against their co-defendants. In November 2016, Dillard entered a guilty plea pursuant to a plea agreement; Dillard did not testify at trial.

---

[1]Taylor's initial guilty plea was vacated after he violated the terms of his plea agreement by providing trial testimony that was not consistent with the factual basis for his plea and, specifically, for refusing to incriminate Jackson and Palmer with respect to certain charges. Taylor subsequently entered a new guilty plea on all of the same counts and executed a new plea agreement with the government. Just as in his original plea, Taylor's second plea agreement incriminated Jackson and Palmer with respect to the dismissed charges.

Palmer moved for a bifurcated trial, asking that the trial on the felon-in-possession charge be severed from the other charges against him to avoid undue prejudice from the introduction of evidence of his prior felony convictions in connection with the felon-in-possession charge. The court denied Palmer's motion, and Palmer subsequently pleaded guilty to the felon-in-possession charge.

### 2.  Gang Evidence Motion in Limine

Prior to trial, the government moved for leave to introduce background evidence of defendants' gang activities. The government argued that evidence of defendants' affiliation with the Heartless Felons Broadway gang (HF Broadway), their ongoing feud with rival gang Heartless Felons Fleet (HF Fleet), and their involvement in several retaliatory drive-by shootings should be admitted as "evidence inextricably intertwined" with the underlying offense, or as evidence of "other acts" under Federal Rule of Evidence 404(b). (R. 55, PID 295–97.) The government asserted that evidence of the defendants' gang activity would show that "[t]he victims [in the instant case] were carjacked so HF Broadway members would have vehicles to use in drive-by shootings, and specifically vehicles not known to HF Fleet members." (*Id*. at PID 292.)

The government proposed to introduce this evidence through two witnesses: Detective Al Johnson of the Cleveland Division of Police would testify about the rivalry between HF Broadway and HF Fleet, and Rembert would testify about Jackson's and Palmer's membership in HF Broadway and roles in the carjackings.

The district court granted in part and denied in part the government's motion. The court concluded that because defendants were not charged with gang activity, the probative value of Detective Johnson's testimony was substantially outweighed by the danger of unfair prejudice to defendants. Detective Johnson therefore did not testify at trial. The court did, however, permit Rembert to testify regarding the relationship between co-defendants as well as the motive for the July 25, 2015 carjacking.

### 3. Counts Remaining at the Start of Trial

When trial began on April 25, 2017, Jackson and Palmer were the only remaining defendants. They were charged as follows:

| Charges Remaining at the Start of Trial | |
|---|---|
| § 2119(2) | § 924(c) |
| **Count 1:**<br>Defendants: Jackson, Palmer<br>Offense Date: July 25, 2015<br>Victim: D.G.<br>Vehicle: 2006 GMC Denali | **Count 2:** Jackson |
| | **Count 4:** Palmer |
| **Count 6:**<br>Defendants: Jackson, Palmer<br>Offense Date: July 26, 2015<br>Victim: Z.N.<br>Vehicle: 2013 Toyota Corolla (gray) | **Count 7:** Jackson |
| | **Count 9:** Palmer |
| **Count 10:**<br>Defendants: Jackson, Palmer<br>Offense Date: July 26, 2015<br>Victim: G.B.<br>Vehicle: 2011 Toyota Corolla (black) | **Count 11:** Jackson |
| | **Count 13:** Palmer |
| **Count 14:**<br>Defendants: Jackson, Palmer<br>Offense Date: August 12, 2015<br>Victim: M.B.<br>Vehicle: 2008 Mazda CX-7 | **Count 15:** Jackson |
| | **Count 17:** Palmer |
| **Count 18:**<br>Defendant: Jackson<br>Offense Date: August 12, 2015<br>Victim: E.M.<br>Vehicle: 2014 Nissan Murano | **Count 19:** Jackson |

### B. Trial Proceedings

The government presented evidence concerning multiple episodes of violence and gang-related criminality in the summer of 2015. The government's evidence consisted of first-hand accounts from the victims of the five charged carjackings; the testimony and reports of Cleveland police officers and FBI agents who responded to the incidents and recovered the stolen vehicles; the testimony of several officers involved in a car chase with Jackson and

Palmer; police interviews with Palmer; the testimony of cooperating co-defendants Rembert and Taylor; DNA and fingerprint evidence linking Jackson and Palmer to the stolen vehicles; video surveillance of defendants using a credit card stolen from one of the victims; and geographical positioning data and photographs extracted from a cellphone linked to Palmer.

During his testimony, Taylor refused to implicate Jackson or Palmer with respect to the carjackings covered by Counts 14 and 18. As a result, the government dismissed those counts and the associated § 924(c) charges. Taylor also refused to implicate Jackson or Palmer with respect to the carjackings covered by Counts 6 and 10, and the government dismissed those counts and the associated § 924(c) charges against Palmer only.

### 1. Background Evidence

The government presented evidence that Palmer, Jackson, and Rembert were members of HF Broadway, a Cleveland street gang embroiled in a violent rivalry with HF Fleet. Palmer held a position of authority in HF Broadway and exercised control over Jackson and Rembert. On July 25, 2015, Palmer, Jackson, Rembert, and Taylor—who was not a member of HF Broadway—set out armed with pistols to retaliate against HF Fleet for an earlier incident. To that end, defendants decided to steal a car to avoid recognition by HF Fleet; Palmer specifically told the group that they needed "to get a car" in order to retaliate. (R. 205, PID 2390–91.) The four drove in Rembert's Buick until Jackson and Taylor spotted a Dodge Intrepid that had already been stolen and required only a screwdriver to operate.[2] Jackson and Taylor got in the Intrepid and drove back to Jackson's house while Palmer and Rembert followed. Once there, all four got into the Intrepid and drove around the neighborhood. When the group spotted a member of HF Fleet, Palmer shot approximately ten rounds at the rival gang member's vehicle. The defendants sped away and headed to "some girl['s] house to grab some more bullets." (*Id.* at PID 2399.) Palmer asked if anyone else in the car needed bullets, retrieved bullets from inside the house, and gave a few to Rembert. All of the foregoing was introduced as background

---

[2]The details surrounding the discovery of the Intrepid are unclear. Rembert's testimony was the only evidence of this event, and Rembert did not clarify whether a member of the group had originally stolen the car and modified the ignition lock cylinder so as to be operable with only a screwdriver.

evidence of Jackson and Palmer's motive; Jackson and Palmer were not charged with any of the conduct just described.

### 2. Count 1: GMC Denali Carjacking

After the shooting, defendants realized that the Intrepid was now recognizable to members of HF Fleet and set out to steal a new vehicle. Rembert testified that they headed to the Tremont area of Cleveland, where Jackson and Taylor spotted something and left the vehicle, brandishing their firearms. While Jackson and Taylor were out of the vehicle, Palmer instructed Rembert to get in the driver's seat and be ready to drive the car. Palmer was carrying a gun at this time. Taylor testified that he and Jackson carjacked a Denali but stated that there was no conversation concerning the plan to do so; he and Jackson "just did it." (R. 206, PID 2575.)

D.G., the victim of the carjacking, testified that he had just finished loading his GMC Denali when he was approached by two or three younger African-American men with guns who demanded his wallet, keys, "and everything else." (R. 203, PID 1918–19.) After threatening to kill him, the men took D.G.'s cellphone, wallet, money, work keys, motorcycle keys, and the Denali. D.G. testified that the men hit him in the back of the head with the butt of a gun so hard that he briefly lost consciousness, and kicked or elbowed him while he was on the ground. D.G. testified that he "had a nice little goose egg on [his] head, and . . . some scraping and bruising like road rash on [his] arm, shoulder, from where [he] went down to the ground" but he declined medical attention. (*Id.* at PID 1931.) D.G. later identified Jackson as one of his assailants with 95% certainty and confirmed that identification at trial.

Driving the stolen Denali, Jackson and Taylor pulled up next to Palmer and Rembert. Palmer and Rembert followed the Denali back to Jackson's house, and all four "started looking through the car just to see what was in there." (R. 205, PID 2405.) They found a credit card, which they then used to purchase items at a Walmart; the government introduced security-camera footage depicting all four using the card. Palmer confessed to an officer that he had used the stolen credit card but told the officer that the victim of the carjacking would not be able to identify him.

The police ultimately recovered D.G.'s Denali near Jackson's house. The police processed the vehicle for physical evidence and discovered both defendants' DNA. Palmer admitted to having been in the Denali sometime after the theft.

### 3. Counts 6 and 10: Carjacking of Two Toyota Corollas

Counts 6 and 10 concern the simultaneous carjackings of two Toyota Corollas from victims Z.N. and G.B. The victims had parked near Z.N.'s house and were walking away from their cars when the carjackings occurred. Z.N. testified that they were carjacked by two African-American men with guns, and Z.N. was able to identify Jackson as one of the perpetrators with 80% certainty. G.B. testified that she and Z.N. had been carjacked and robbed at gunpoint by two African-American men, but she was unable to identify them.

Beyond the victims' testimony, the government's evidence connecting Jackson and Palmer to the carjackings was indirect because Taylor—the government's only cooperating witness with knowledge of these carjackings—contradicted his earlier statements and did not incriminate Jackson or Palmer. Taylor refused to name anyone else who was involved in the carjackings, although he suggested there was at least one other person with him. Because Taylor contradicted the factual basis for his plea, the government introduced as impeachment evidence Taylor's prior statements that Jackson and Palmer had been involved in the double carjacking of the Corollas.

The remaining evidence consisted of palm prints found in Z.N.'s gray Corolla belonging to Jackson, fingerprints found in G.B.'s black Corolla belonging to Palmer, the testimony of several officers who engaged Jackson and Palmer in a high-speed chase while Jackson and Palmer were driving in one of the Corollas, and Palmer's confession that he had been in one of the Corollas. Further, the Corollas were recovered near Jackson's home despite being stolen in another Cleveland neighborhood. Because Taylor refused to testify against Jackson and Palmer, the government relied on the evidence described above to secure Jackson's conviction, but dismissed all charges associated with the double carjacking as to Palmer.

### 4. Counts 14 and 18: Dismissed Charges

Taylor refused to testify against Jackson and Palmer concerning the carjackings at issue in Counts 14 and 18. Taylor contradicted the factual basis for his plea and testified that he had acted alone in committing these carjackings. The government introduced his prior inconsistent statements as impeachment evidence, but ultimately dismissed these charges in their entirety after Taylor refused to implicate Jackson and Palmer.

Prior to Taylor's testimony, however, the government had introduced evidence that Jackson's fingerprints were inside the stolen Nissan Murano, that pictures of the stolen Mazda CX-7 were discovered on Palmer's cellphone, and that victim M.B.'s ATM card and work ID were later recovered in the gray Toyota, indicating a possible link to the carjacking charged in Count 6.

### 5. Charges Presented to the Jury

After the close of evidence, the following counts remained for the jury's consideration:

| Charges Presented to the Jury | |
| --- | --- |
| **§ 2119(2)** | **§ 924(c)** |
| **Count 1:**<br>Defendants: Jackson, Palmer<br>Offense Date: July 25, 2015<br>Victim: D.G.<br>Vehicle: 2006 GMC Denali | **Count 2:** Jackson |
| | **Count 4:** Palmer |
| **Count 6:**<br>Defendants: Jackson<br>Offense Date: July 26, 2015<br>Victim: Z.N.<br>Vehicle: 2013 Toyota Corolla (gray) | **Count 7:** Jackson |
| **Count 10:**<br>Defendants: Jackson<br>Offense Date: July 26, 2015<br>Victim: G.B.<br>Vehicle: 2011 Toyota Corolla (black) | **Count 11:** Jackson |

Palmer and Jackson both moved for a judgment of acquittal, and the court denied both motions. However, the court found that the government had failed to prove that any victim sustained "serious bodily injury," and instructed the jury on the carjacking charge without an enhancement for serious bodily injury. (R. 207, PID 2666–69.)

### 6. Closing Arguments, Jury Instructions, and Verdict

At closing, the government argued that the jury should return a guilty verdict on all the remaining counts without referring to the evidence relating to the dismissed counts. Jackson and Palmer's counsel argued that the government had failed to meet its burden and that Taylor's testimony warranted acquittal.

The district court instructed the jury that it must determine defendants' guilt or innocence based on the evidence relevant to each charge and that it could not consider the evidence of uncharged acts—such as the evidence of defendants' gang affiliations—for anything other than evidence of motive. After deliberations, the jury returned guilty verdicts on all counts.

Palmer and Jackson both submitted written motions for judgments of acquittal, arguing that the trial evidence was insufficient to support their convictions. The district court denied both motions.

### C. Sentencing

#### 1. Palmer

The district court sentenced Palmer to a total of 175 months in prison consisting of 115 months on the carjacking count followed by a consecutive 60-month sentence for the § 924(c) count. Palmer challenged the application of a two-level enhancement for bodily injury, but the district court rejected Palmer's objection and applied the enhancement.

#### 2. Jackson

Jackson argued that the sentences for the two § 924(c) convictions stemming from the double carjacking of the Corollas should run concurrently with one another. Jackson also requested a one-day sentence on his three carjacking convictions, arguing that the substantial

mandatory minimum sentences for his § 924(c) convictions warranted a downward departure. Jackson also argued that a Guidelines sentence would constitute cruel and unusual punishment in violation of the Eighth Amendment in light of his youth. Jackson's attorney asked the court to consider Jackson's mental health, age, poor upbringing, and history of drug use and dependency, and also asked the court to consider Jackson's sentence as compared to the sentences of his co-defendants. Jackson's father and sister spoke on his behalf, but Jackson himself did not.

The district court determined that it was required to impose consecutive sentences for the § 924(c) convictions. The court considered Jackson's relative youth and appears to have recognized that it had the discretion to depart downward from the Guidelines range. The court found, however, that a sentence of one day for the carjacking convictions "would be an absolute insult" to Jackson's victims and would fail to adequately punish Jackson. (R. 197, PID 1693–94.) The court stated that because Jackson chose "to terrorize innocent people, [he] must suffer the consequence, and here the consequence is spending the majority of [his] adult life in prison." (*Id.* at PID 1694.)

The court imposed a 771-month term of imprisonment consisting of a bottom-of-the-Guidelines sentence of 87 months on the carjacking counts and consecutive sentences of 7, 25, and 25 years on the § 924(c) counts.[3]

## II. Discussion

Jackson and Palmer appealed, challenging their convictions and respective sentences, and we consolidated the appeals for briefing.

Jackson and Palmer argue that (1) the government's evidence was insufficient to support their convictions, (2) the introduction of evidence relating to later-dismissed counts constituted retroactive misjoinder, (3) the district court erred by permitting Rembert to testify regarding

---

[3]Under § 924(c), a first-time offender who is found to have brandished a firearm must be sentenced to a minimum sentence of seven years to run consecutively to all other sentences. 18 U.S.C. § 924(c)(1)(A)(ii). Because the jury found that Jackson had brandished the firearm, the district court was required to impose a seven-year consecutive sentence. Defendants who are convicted of a "second or subsequent" violation of § 924(c) must "be sentenced to a term of imprisonment of not less than 25 years" to run consecutively to all other sentences. 18 U.S.C. § 924(c)(1)(C)(i). The court imposed consecutive 25-year sentences for the second and third convictions.

defendants' gang affiliation, and (4) the district court erred by denying defendants' motions to dismiss the § 924(c) charges because carjacking does not qualify as a "crime of violence." With respect to their sentences, Jackson and Palmer both challenge the district court's finding that victim D.G. sustained a "bodily injury" warranting the application of a Guidelines enhancement.

Jackson also argues that the sentences for his § 924(c) convictions stemming from the double carjacking should run concurrently with one another or, in the alternative, that the evidence was insufficient to support two § 924(c) convictions. Jackson additionally challenges the reasonableness of his sentence, arguing that the district court failed to consider his relative youth and the disparity between his sentence and those of his co-defendants. Finally, Jackson argues that a 771-month sentence violates his Eighth Amendment right to be free from cruel and unusual punishment.

## A. Sufficiency of the Evidence

Jackson and Palmer argue that the government failed to present sufficient evidence to support their convictions. Jackson challenges the sufficiency of the evidence only as to the counts involving the two Corollas; he does not challenge the sufficiency of the evidence supporting his convictions involving the GMC Denali. Palmer challenges the sufficiency of the evidence on the counts involving the GMC Denali carjacking, the only counts of which he was convicted.

### 1. Standard of Review and Applicable Law

"[W]e will reverse a judgment for insufficiency of evidence only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence." *United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015) (alteration in original) (quoting *United States v. Grubbs*, 506 F.3d 434, 438 (6th Cir. 2007)). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "Circumstantial evidence alone can meet this burden," *United States v. Washington*, 702 F.3d 886, 891 (6th Cir. 2012) (citing *United States v. Fekete*, 535 F.3d 471,

476 (6th Cir. 2008)), and all "reasonable inferences and resolutions of credibility are made in the jury's favor," *id.* (citing *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)).

Defendants were convicted under two statutes: 18 U.S.C. § 2119 and 18 U.S.C. § 924(c). A person can be convicted under § 2119 if the government proves that, "with the intent to cause death or serious bodily harm[, he] takes a motor vehicle that has been transported, shipped, or received in interstate or foreign commerce from the person or presence of another by force and violence or by intimidation, or attempts to do so." Sub-sections (1), (2), and (3) of § 2119 establish maximum terms of imprisonment. Under § 2119(1), a person convicted of the base offense is subject to a maximum term of imprisonment of 15 years. Under § 2119(2), the maximum term of imprisonment is increased to 25 years if the carjacking resulted in "serious bodily injury." Jackson and Palmer were both originally charged under § 2119(2), but the district court found that the government had failed to demonstrate any serious bodily injury and submitted only the base offense to the jury.

Pursuant to § 924(c), "any person who, during and in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall" be subject to a mandatory minimum sentence to run consecutively to any other sentence. Whether carjacking constitutes a crime of violence for the purposes of § 924(c) is a legal determination and is discussed in Section II.D below; the district court instructed the jury that carjacking constitutes a crime of violence.

Pursuant to 18 U.S.C. § 2, any person who "aids, abets, counsels, commands, induces or procures" the commission of an offense "is punishable as a principal."

Because a sufficiency challenge necessitates a fact-intensive inquiry, we address Jackson's and Palmer's arguments separately.

### 2. The Evidence Was Sufficient to Convict Jackson of the Charges Related to the Corolla Carjackings

Jackson argues that no reasonable jury could have found him guilty of the charges relating to the double carjacking because Taylor's testimony tended to exculpate him. Jackson asserts that the jury should have accepted Taylor's testimony at face value. But, Taylor's

credibility was impeached by his prior inconsistent statements; Taylor admitted he had previously told police that Jackson had been with him during the Corolla carjackings. And, witness credibility is quintessentially a question of fact for the jury. *See Washington*, 702 F.3d at 891. Perhaps a reasonable jury could have believed Taylor's testimony and acquitted Jackson. However, it was reasonable for this jury to disbelieve Taylor.

In addition, other evidence tended to implicate Jackson. One of the victims, Z.N., identified Jackson as one of the carjackers with 80% certainty; Jackson's palm prints were found in one of the Corollas; an officer testified that Jackson was in one of the Corollas as the officer pursued the car in a high-speed chase; and the Corollas were recovered near Jackson's home despite being stolen in another neighborhood. Because the jury's determinations were reasonable, we affirm the denial of Jackson's motion for acquittal based on sufficiency of the evidence.

Jackson argues separately that he cannot be convicted of two § 924(c) charges arising out of the double carjacking, and we address that argument in Section II.F, below.

### 3. The Evidence Was Sufficient to Convict Palmer of the Charges Related to the Denali Carjacking

Regarding the Denali carjacking, the jury found Palmer guilty of "Carjacking, and/or Aiding and Abetting Carjacking." (R. 126, PID 835.) Palmer argues that no reasonable jury could have convicted him of the Denali carjacking under an aiding-and-abetting theory.

Although there was no evidence that Palmer committed the Denali carjacking himself, the government relied on an aiding-and-abetting theory. The jury heard evidence that Palmer held a leadership position in HF Broadway and was able to exert control over Jackson and Rembert. Palmer was part of the plan to steal the Intrepid and was an active participant in the later drive-by shooting using the Intrepid. After the shooting, Palmer asked the occupants of the car—all of whom were carrying firearms—if they needed more bullets, and then provided additional bullets to Rembert. The group then decided to steal a new car, but there was no testimony as to any specific comments by Palmer concerning this plan. Taylor testified that there

was no conversation whatsoever concerning the Denali carjacking before it happened and that Taylor and Jackson "just did it." (R. 205, PID 2401; R. 206, PID 2575–76.)

When Jackson and Taylor left the car with guns drawn, Palmer told Rembert to get into the driver's seat of the car—which had previously been occupied by Taylor—so that Rembert could "drive the car that [they were] already in." (R. 205, PID 2404.) Palmer was carrying a firearm at this time. When Jackson and Taylor pulled alongside them in the stolen Denali, the group drove the two cars back to Jackson's house where "everybody started looking through the [Denali] just to see what was in there." (R. 205, PID 2405.) When they found a credit card, the group went to Walmart where Palmer and the others used the stolen card to purchase items. DNA evidence indicated that Palmer had been inside the Denali, and this fact was corroborated by Palmer's own statements to the police. Finally, when questioned by police about the Denali carjacking, Palmer said that the victim would not be able to identify him.

When viewed in the light most favorable to the government, this evidence is sufficient to convict Palmer as an aider and abettor of the Denali carjacking. A reasonable jury could find that Palmer was aware of the plan to commit a carjacking and supported that plan by supplying the group with bullets and ensuring that Rembert got into the driver's seat in order to act as a getaway driver. A reasonable jury could also have concluded, based on the evidence that Palmer occupied a leadership role in HF Broadway, that Palmer did not commit the carjacking himself because he directed his subordinates to do so.

Although it might also have been reasonable for a jury to conclude that Palmer either was unaware of the plan or thought that Jackson and Taylor were committing a crime other than carjacking, the jury here did not reach that conclusion, and we cannot say that the jury's finding was unreasonable. And, because the jury heard evidence both that Palmer was carrying a firearm during this episode and that Palmer offered to supply bullets to Rembert, Jackson, and Taylor before the group set out to obtain another vehicle, the evidence is also sufficient to convict Palmer of the attendant § 924(c) charge. We thus affirm the district court's denial of Palmer's motion for acquittal based on sufficiency of the evidence.

**B. Retroactive Misjoinder**

Jackson and Palmer both argue that they were denied due process when the government introduced evidence related to counts that it "knew or should have known" could not be proven beyond a reasonable doubt. (Palmer Br. 38–41; Jackson Br. 33–35.) Jackson and Palmer advance substantively identical arguments, but only Jackson explicitly refers to a theory of "retroactive misjoinder." (*See* Reply at 2.)

Jackson and Palmer argue that the government acted in bad faith when, knowing that Taylor's testimony was uncertain, it waited to put him on the stand until twenty-six other witnesses had already testified, several of whom testified concerning later-dismissed counts.

They also argue that they suffered "compelling prejudice" because "[t]he jury could not un-hear the totality of the allegations" against them. (Reply Br. 2–3; *see also* Palmer Br. 39–40.) Jackson and Palmer argue that once the government dismissed Counts 14, 18, and the associated § 924(c) charges, the evidence related to those counts was inadmissible because it concerned "the other carjackings that were dismissed [and was] not intrinsic to" the remaining counts. (Palmer Br. 40; *see also* Jackson Br. 34–35.)

In support of their argument that the government acted in bad faith, Jackson and Palmer assert that after defense counsel cautioned the court that Taylor had given several contradictory statements, the district court "decided that 'we should hear from Mr. Taylor first.'" (Palmer Br. 39 (quoting R. 205 at PID 2258–59); *see also* Reply at 2.) Jackson and Palmer thus suggest that the district court directed the government to call Taylor as a witness early in the trial but that the government failed to do so as part of a deliberate effort to introduce evidence concerning charges it knew would ultimately be dismissed. However, the quoted discussion occurred not at the beginning of trial, but after fifteen witnesses had already testified. And, the discussion concerned the proffered testimony of Detective Middaugh of the Cleveland Police Department's Gang Impact Unit, who was expected to testify concerning evidence connecting Palmer to guns used during one of the later carjackings.[4]

---

[4]The court ultimately ruled that Detective Middaugh could not testify about the firearms before Taylor's testimony because Taylor's testimony would be the only evidence connecting Palmer to that carjacking. The court

### 1. Standard of Review and Applicable Law

"Retroactive misjoinder refers to circumstances in which the joinder of multiple counts was proper initially, but later developments . . . render the initial joinder improper." *United States v. Daniels*, 653 F.3d 399, 414 (6th Cir. 2011) (quoting *United States v. Jones*, 482 F.3d 60, 78 (2d Cir. 2006)). To succeed on a retroactive misjoinder claim "in which a defendant alleges that the prejudicial 'spillover' of otherwise inadmissible evidence influenced the jury's decision on the remaining counts, the defendant must show either 'compelling prejudice' or that the prosecutor acted in 'bad faith' in bringing the charge." *Id.* (quoting *United States v. Deitz*, 577 F.3d 672, 693 (6th Cir. 2009)). A defendant bears a "very heavy" burden of showing prejudicial misjoinder. *Deitz*, 577 F.3d at 693 (quotations omitted).

In determining whether a defendant suffered compelling prejudice, we consider factors including the jury's ability to separate the spillover evidence from the properly admitted evidence, *see, e.g, United States v. Murphy*, 836 F.2d 248, 256 (6th Cir. 1988), and whether the "'spillover' evidence would have 'tended to incite or arouse the jury into convicting the defendant on the remaining counts,'" *Daniels*, 653 F.3d at 415 (quoting *Jones*, 482 F.3d at 78). In determining whether the government acted in bad faith, the court may consider whether the prosecutor "had 'a reasonable expectation of obtaining a valid conviction'" on the charges that were ultimately found to be improperly joined. *Daniels*, 653 F.3d at 414 (quoting *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975)).

Because Jackson and Palmer advance their retroactive misjoinder claim for the first time on appeal, we review for plain error. *See, e.g., United States v. Soto*, 794 F.3d 635, 655 (6th Cir. 2015). As the Supreme Court has explained, plain-error review proceeds in four steps:

> First, there must be an error or defect—some sort of deviation from a legal rule— that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must

---

stated that if Taylor testified consistently with the factual basis of his plea, it would allow the government to recall Detective Middaugh for additional testimony. Because Taylor's testimony ultimately did not implicate Palmer in that carjacking, the government dismissed the relevant counts and Detective Middaugh was not recalled.

demonstrate that it affected the outcome of the district court proceedings. Fourth and finally, if the above three prongs are satisfied, the court of appeals has the *discretion* to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. Meeting all four prongs is difficult, as it should be.

*Puckett v. United States*, 556 U.S. 129, 135 (2009) (internal citations, quotations, and alterations omitted).

## 2. Discussion

Both defendants argue that they are entitled to a new trial because the joinder of the later-dismissed claims—and the admission of evidence concerning those claims—either resulted in compelling prejudice or was the result of bad faith on the part of the government.

Nothing in the record supports a finding of compelling prejudice here. Although the evidence of additional carjackings might tend to arouse or incite the jury, it was the same type of evidence that was admitted in support of the charges that were submitted to the jury. Because all the evidence concerned violent, gang-related criminality, additional evidence of similar conduct is unlikely to have further aroused or incited the jury. Indeed, the properly admitted evidence was more potentially inflammatory than the evidence of the later-dismissed charges: it consisted of first-hand accounts of defendants' violent conduct, as well as descriptions of defendants' use of the stolen cars in an ongoing gang war. The evidence also concerned discrete carjackings, and the jury was therefore capable of following the district court's instructions to consider only the evidence concerning the charges before it. These factors all counsel against a finding of compelling prejudice.

Defendants' argument that the government acted in bad faith is also unavailing. Although the government was aware that Taylor may have been a less-than-ideal witness, the government had "a reasonable expectation of obtaining a valid conviction" on the indicted charges in light of Taylor's prior sworn statements and the factual basis for his plea agreement. *Daniels*, 653 F.3d at 414 (quoting *Kugler*, 421 U.S. at 126 n.6). And, when it became clear that Taylor would not testify consistent with his plea, the government withdrew the charges that it felt were no longer supported by the evidence. Further, defendants' argument that the government

acted in bad faith by deliberately calling Taylor late in the trial relies on a discussion between the court and counsel that occurred midway through the government's case. Defendants offer no other evidence in support of a finding of bad faith, and the record contains none.

We therefore conclude that defendants have not demonstrated retroactive misjoinder.

## C. Admission of Rembert's Gang Testimony

Jackson and Palmer next argue that the "only reason" the government introduced evidence of their membership in HF Broadway was to show their propensity for crime and violence. (Palmer Br. 42; Jackson Br. 41.) They argue that this evidence should have been excluded because "the concept of a 'gang' necessarily produces egregious associations in the minds of the jury . . . the effect being to convict and punish the Defendants on the basis of activities of other unrelated individuals, and on the basis of other crimes unrelated to [the defendants'] activities." (Palmer Br. 42; *see also* Jackson Br. 41.) Jackson and Palmer also argue that the court erred in denying their request to hold a hearing at which to conduct a Rule 403 analysis.

### 1. Standard of Review and Applicable Law

Pursuant to Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." District courts employ a three-step process for determining the admissibility of such evidence:

> First, the district court must decide whether there is sufficient evidence that the other act in question actually occurred. Second, if so, the district court must decide whether the evidence of the other act is probative of a material issue other than character. Third, if the evidence is probative of a material issue other than character, the district court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003) (citing *United States v. Haywood*, 280 F.3d 715, 720 (6th Cir. 2002)).

Cases in this circuit have articulated two standards of review for the admissibility of Rule 404(b) evidence. *See, e.g, United States v. Clay*, 667 F.3d 689, 703 (6th Cir. 2012) (recognizing the "longstanding intra-circuit conflict regarding the appropriate standard of review for evidentiary decisions under Rule 404(b)") (Kethledge, J., dissenting).  The disagreement concerns whether we review such rulings under the abuse-of-discretion standard generally applicable to evidentiary decisions, *United States v. Qin*, 688 F.3d 257, 261 (6th Cir. 2012), or whether we treat the admissibility determination as a legal issue and review de novo, *United States v. Mack*, 729 F.3d 594, 601 (6th Cir. 2013).  Because the district court did not err under either standard of review, however, we do not further consider the issue.

### 2.  Discussion

Under either standard, the district court properly admitted Rembert's testimony as evidence of the defendants' motive for the commission of the charged offenses.  The district court issued a thorough order concerning the scope of admissible evidence and properly instructed the jury that other crimes, acts, or wrongs could be considered only as to motive.  The district court denied the government's request to present testimony from Detective Johnson concerning the defendants' gang affiliation, but allowed Rembert to testify to "his relationship with Defendants, Defendants' positions in HF Broadway, their roles in the carjackings, and the purpose of the carjackings."  (R. 74, PID 439.)  The district court noted the government's argument that "Palmer stated to law enforcement that no victim can identify him . . . because Palmer ordered others to commit the carjackings for him."  (*Id.* at PID 439–40.)  The district court further found that Rembert's testimony was admissible because it was evidence that the Denali carjacking was motivated by a desire to use a stolen car in retaliatory shootings against HF Fleet.

The district court reasonably found that the background evidence was admissible as evidence of motive under Rule 404(b) and was not substantially more prejudicial than probative.

### D.  Whether Carjacking is a Crime of Violence Under § 924(c)

Jackson and Palmer argue that carjacking fails to qualify as a crime of violence under 18 U.S.C. § 924(c) and cannot support their § 924(c) convictions.  In particular, defendants argue

that carjacking fails to qualify as a crime of violence under § 924(c)'s "elements clause" and that § 924(c)'s "residual clause" is unconstitutionally vague given its similarity to the residual clause in 18 U.S.C. § 16(b), which the Supreme Court held is unconstitutionally vague as incorporated into the Immigration and Nationality Act's definition of "aggravated felon." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1215 (2018).

The federal carjacking statute provides that a person is guilty of carjacking when, "with the intent to cause death or serious bodily harm," a person "takes a motor vehicle . . . from the person or presence of another by force and violence or by intimidation." 18 U.S.C. § 2119. Jackson and Palmer argue that carjacking is not a crime of violence under § 924(c)'s elements clause because it is possible to commit § 2119 carjacking without the use, attempted use, or threatened use of physical force. Jackson and Palmer rely on Merriam-Webster's definition of "intimidation"—"to make timid or fearful; to compel or deter by or as if by threats." (Palmer Br. 46; Jackson Br. 50.) Palmer further cites a handful of out-of-circuit cases defining "intimidation" in the context of bank robbery under § 2113 as occurring when "an ordinary person in the [victim's position] reasonably could infer a threat of bodily harm from the defendant's acts." (Palmer Br. 46.)

In arguing that intimidation "does not require the use or threatened use of 'violent force' against another" (Palmer Br. 47; *see also* Jackson Br. 52), defendants rely on *United States v. Torres-Miguel*, where the Fourth Circuit considered a California statute that criminalized threatening to commit a crime that will result in "death or great bodily injury." 701 F.3d 165, 168 (4th Cir. 2012). The Fourth Circuit concluded that that the California statute did not set out a crime of violence because "a crime may *result* in death or serious injury without involving *use* of physical force." *Id.* at 168–69. Defendants thus argue that intimidation requires only a threat of bodily harm, which does not necessarily encompass a threat of violent physical force as required by the elements clause of § 924(c).

In response, the government relies on our decision in *United States v. Taylor*, 814 F.3d 340 (6th Cir. 2016), where we held that carjacking is a crime of violence under § 924(c)'s residual clause. (Gov't Br. 45.) Beyond citing *Taylor*, the government's brief advances no argument concerning carjacking's status as a crime of violence.

**1. Standard of Review and Applicable Law**

Whether a crime constitutes a "crime of violence" under 18 U.S.C. § 924(c) is a legal question that we review de novo. *United States v. Rafidi*, 829 F.3d 437, 443 (6th Cir. 2016).

Section 924(c)(1)(A) imposes a mandatory minimum sentence on

> any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm.

Section 924(c)(3) defines "crime of violence" as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (elements clause) or "that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (residual clause). Because carjacking is a crime of violence under § 924(c)'s elements clause, we do not consider the validity of the residual clause after *Dimaya*.

**a. § 924(c)'s Elements Clause**

Section 924(c)'s elements clause defines a crime of violence as one that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." We have not yet decided whether § 2119 carjacking satisfies this requirement, but a number of our sister circuits have held that carjacking is a crime of violence under § 924(c)'s elements clause. And, we have previously held that an analogous statute criminalizing bank robbery committed by intimidation satisfies § 924(c)'s elements clause.

**i. Out-of-Circuit Cases**

A number of other circuits have held that carjacking is a crime of violence under § 924(c)'s elements clause. Defendants have not cited—and we are unaware of—any cases in which other circuits have concluded that carjacking fails to satisfy the elements clause.

The First, Fourth, and Fifth Circuits have all recently held that carjacking is a crime of violence under § 924(c)'s elements clause. *See United States v. Cruz-Rivera*, 904 F.3d 63 (1st Cir. 2018); *United States v. Evans*, 848 F.3d 242 (4th Cir.), *cert. denied*, 137 S. Ct. 2253 (2017); *United States v. Jones*, 854 F.3d 737 (5th Cir.), *cert. denied*, 138 S. Ct. 242 (2017). The *Cruz-Rivera*, *Evans*, and *Jones* courts relied on earlier precedent in their respective circuits holding that bank robbery in violation of 18 U.S.C. § 2113—which requires that the robbery be committed "by force and violence, or by intimidation"—constitutes a crime of violence under § 924(c)'s elements clause. *See Cruz-Rivera*, 904 F.3d at 66; *Evans*, 848 F.3d at 246–47; *Jones*, 854 F. 3d at 740. Recognizing that § 2113's language is substantively identical to § 2119's, all three courts held that § 2119 likewise qualifies as a crime that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" under § 924(c). *Cruz-Rivera*, 904 F.3d at 66; *Evans*, 848 F.3d at 247; *Jones*, 854 F.3d at 741. And, in all three cases, the court specifically considered and rejected the argument proffered by Jackson and Palmer here: that "intimidation" does not require the use or threatened use of violent force. *See Cruz-Rivera*, 904 F.3d at 66 (noting that precedent established that "the force clause encompasses federal bank robbery even though that offense, too, may be committed through 'intimidation'"); *Evans*, 848 F.3d at 247 ("The act of taking a motor vehicle 'by force and violence' requires the use of violent physical force, and the act of taking a motor vehicle 'by intimidation' requires the threatened use of such force."); *Jones*, 854 F.3d at 740. Finally, the court in *Cruz-Rivera* bolstered its holding by noting that the federal carjacking statute requires that the government prove a defendant committed the offense "with the intent to cause death or serious bodily harm." *Cruz-Rivera*, F.3d at 66 (citing 18 U.S.C. § 2119).

Jackson and Palmer rely on the Fourth Circuit's decision in *Torres-Miguel*, where the court held that a California conviction for threatening to commit a crime that would result in physical injury does not constitute a crime of violence. In *Evans*, however, the Fourth Circuit found that its own precedent in *Torres-Miguel* did not support a holding that carjacking is not a crime of violence under § 924(c)'s elements clause because "unlike the statute at issue in *Torres-Miguel*, the carjacking statute includes the statutory element of 'by force and violence or by intimidation' . . . [and] the term 'intimidation' used in this context means a threat of violent force." *Evans*, 848 F.3d at 247.

The Eleventh Circuit recently reached the same conclusion. *See Craig v. United States*, 703 F. App'x 798 (11th Cir. 2017); *In re Smith*, 829 F.3d 1276, 1280 (11th Cir. 2016). With limited discussion, the Eleventh Circuit in *In re Smith* held that "an element requiring that one take or attempt to take by force and violence or by intimidation, which is what the federal carjacking statute does, satisfies the force clause of § 924(c)." *In re Smith*, 829 F.3d at 1280–81. In *Craig*, the Eleventh Circuit reaffirmed its holding in *In re Smith*. *See Craig*, 703 F. App'x at 802.

### ii. Sixth Circuit Cases

We have held that § 2113 bank robbery—which, just like carjacking, requires that the robbery be committed "by force and violence, or by intimidation"—constitutes a crime of violence under both the Guidelines and under § 924(c)'s elements clause. *See United States v. McBride*, 826 F.3d 293 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 830 (2017); *United States v. Henry*, 722 F. App'x 496 (6th Cir. 2018). Like the Fourth and Fifth Circuits, we recognized that a "taking by intimidation under § 2113(a) . . . involves the threat to use physical force." *McBride*, 826 F.3d at 296 (reaching that conclusion under the Guidelines' elements clause); *Henry*, 722 F. App'x at 500 ("[I]ntimidation is all it takes to satisfy § 924(c)(3)(A)'s elements clause, which defines crimes involving the 'threatened use of physical force' as crimes of violence.").

### 2. Discussion

Although we have not yet ruled squarely on this issue, we have held that bank robbery by intimidation necessarily involves the use, attempted use, or threatened use of violent physical force. Because the federal bank robbery and carjacking statutes use identical language, our precedent requires us to conclude—as have the Fourth, Fifth, and Eleventh Circuits—that the commission of carjacking by "intimidation" necessarily involves the threatened use of violent physical force and, therefore, that carjacking constitutes a crime of violence under § 924(c)'s elements clause. This conclusion is further supported by the fact that the carjacking statute requires that the government prove the defendant committed the offense "with the intent to cause death or serious bodily injury," 18 U.S.C. § 2119, and by our previous holding that the "act of

brandishing a firearm during a carjacking, without more, is not sufficient to prove specific intent to kill or cause serious bodily harm to the victim" as required by § 2119, *United States v. Mack*, 729 F.3d 594, 603 (6th Cir. 2013) (citing *Holloway v. United States*, 526 U.S. 1, 11 (1999)). Instead, the government "must produce evidence that the defendant did more than make an 'empty threat' or 'intimidating bluff.'" *Id.* at 603–04.

### E. Whether the District Court Erred in Finding that Victim D.G. Suffered Bodily Injury for Purposes of Applying a Sentence Enhancement

Jackson and Palmer next argue that the injuries D.G. sustained during the Denali carjacking do not constitute "bodily injury" under § 2B3.1(b)(3)(A) of the Guidelines and the district court therefore erred in applying a two-level bodily-injury enhancement. (Palmer Br. 51–53; Jackson Br. 52–54.) The evidence at trial established that one of the perpetrators pistol-whipped D.G. so hard that he lost consciousness momentarily, leaving him with a "goose egg" lump on his head and scrapes and bruises on his arm and shoulder. (R. 203, PID 1921, 1931.) Although D.G. did not seek medical attention for these injuries, the district court found that this evidence was sufficient to support a bodily-injury enhancement.[5]

Jackson and Palmer cite no cases holding that injuries comparable to D.G.'s are insufficient to support a bodily-injury enhancement. Instead, they cite several out-of-circuit cases applying the enhancement and argue that the instant case is distinguishable. For instance, Jackson and Palmer cite cases in which the Seventh Circuit found "bodily injury" where a victim was sprayed with mace, *see United States v. Robinson*, 20 F.3d 270, 278–79 (7th Cir. 1994), and argue that D.G.'s injuries are distinguishable.[6] Jackson and Palmer also cite a Seventh Circuit case affirming application of the bodily-injury enhancement where a victim was knocked down causing bumps, bruises, and a back injury requiring chiropractic treatment. *See United States v. Hamm*, 13 F.3d 1126, 1127–28 (7th Cir. 1994). Jackson and Palmer assert that D.G.'s injuries

---

[5]As noted above, the district court found that the government had not presented sufficient evidence for a reasonable jury to find that the carjacking had resulted in "serious bodily injury" so as to increase the maximum sentence for the carjacking conviction. That issue is distinct from the question whether the government had presented evidence of "bodily injury" to support a Guidelines enhancement.

[6]Jackson and Palmer also note that the Fourth Circuit has reached the opposite conclusion and held that a victim who was sprayed with mace did not suffer a bodily injury. *See United States v. Lancaster*, 6 F.3d 208, 210 (4th Cir. 1993).

were less severe than required to support the enhancement in part because D.G. did not seek medical attention.

### 1. Standard of Review and Applicable Law

"Legal conclusions regarding [application of the sentencing] guidelines are reviewed de novo; however, this circuit gives due deference to the district court's application of the guidelines to the facts pursuant to 18 U.S.C. § 3742(a)." *United States v. Cline*, 362 F.3d 343, 350 (6th Cir. 2004) (alteration in original) (quoting *United States v. Smith*, 320 F.3d 647, 657 (6th Cir. 2003)).

U.S.S.G. § 2B3.1(b)(3)(A) provides for a two-level enhancement for bodily injury. Pursuant to the application notes, "bodily injury" means "any significant injury, e.g., an injury that is painful and obvious, or is the type for which medical attention ordinarily would be sought." U.S.S.G. § 1B1.1, Application Note 1(B).

### 2. Discussion

Defendants' argument appears to hinge on the fact that D.G. did not seek medical attention for his injuries. But, under the Guidelines, a victim need not actually seek medical attention; all that is required is that the injury be significant, which includes an injury that is "painful and obvious" or "the type for which medical attention would ordinarily be sought." U.S.S.G. § 1B1.1, Application Note 1(B). D.G.'s injuries rise to that level: not only was he hit so hard that he lost consciousness, he also sustained a serious contusion—a "goose egg" lump on his head—as well as scrapes and minor bruises on his arm and shoulder. Courts regularly apply the "bodily injury" requirement in situations involving less severe injuries. *See, e.g., United States v. Fitzwater*, 896 F.2d 1009, 1012 (6th Cir. 1990) (applying a two-level enhancement to the defendant bank robber "when a bank teller hit her head and hip on her teller's drawer in the course of lying down on the floor during the robbery"). And, Jackson and Palmer cite no case in which similar injuries were found insufficient to constitute bodily injury under the Guidelines.

In light of the deference due the district court's application of the Guidelines to the facts before it, we affirm the application of the bodily-injury enhancement.

**F.  The Evidence Does Not Support Jackson's Convictions on Counts 7 and 11 As Separate § 924(c) Offenses**

Jackson appears to advance two distinct arguments in support of his position that he should only be subject to one 25-year term of imprisonment for the two § 924(c) charges associated with the double carjacking of the Corollas, but he conflates those arguments at times. He first argues that the sentences associated with those § 924(c) convictions should run concurrently rather than consecutively.  Alternatively, Jackson argues that the evidence is sufficient to support only a single § 924(c) conviction.  Jackson requests the same relief under both arguments: that we vacate his sentence and remand for resentencing with instructions to apply only a single § 924(c) sentence arising out of the Corolla carjackings.

In support of this position, Jackson primarily relies on two cases from the Sixth Circuit and one from the Second Circuit.  Jackson first cites our decision in *United States v. Taylor*, 13 F.3d 986 (6th Cir. 1994) for the proposition that multiple, consecutive § 924(c) sentences cannot be sustained where they are predicated on a single underlying offense.  The indictment in *Taylor* charged a single predicate drug trafficking offense, but the defendant was convicted of two separate § 924(c) charges based on his possession of two firearms.  *Id.*  The *Taylor* court held that possession of multiple firearms in connection with a single predicate offense is insufficient to support multiple § 924(c) convictions because § 924(c) "emphasizes the relationship between the firearms and the underlying drug-trafficking crime, rather than the individual firearms themselves." *Id.* at 993 (quoting *United States v. Lindsay*, 985 F.2d 666, 673 (2d Cir. 1993)).  The court thus concluded that "§ 924(c)'s unit of prosecution is the underlying offense, not the number of firearms."  *Id.* at 994.  As a result, the court held that where an "indictment charges a single predicate offense, a court may not enter a judgment of conviction against a defendant, and may not sentence a defendant, for multiple § 924(c) counts in relation to that single predicate offense." *Id.*

Jackson next cites our decision in *United States v. Roy Lee Johnson*, 25 F.3d 1335 (6th Cir. 1994) (en banc).  In *Roy Lee Johnson*, law enforcement officers had executed a search warrant at the defendant's residence and found two firearms and two different types of controlled substances.  *Id.* at 1336.  The defendant was convicted of two counts of possession with intent to

distribute—one count for each type of controlled substance—and two § 924(c) counts—one count predicated on each controlled substance offense. *Id.* We thus considered the "narrow question . . . whether a defendant may be sentenced to two or more consecutive terms for violating 18 U.S.C. § 924(c)(1) by possessing firearms while simultaneously trafficking in two or more controlled substances." *Id.* We concluded that "possession of one or more firearms in conjunction with predicate offenses involving simultaneous possession of different controlled substances should constitute only one offense under § 924(c)(1)." *Id.* at 1338.

Finally, Jackson cites the Second Circuit's decision in *United States v. Finley*, where the defendant was convicted of two underlying controlled substances offenses: distribution and possession with intent to distribute. 245 F.3d 199 (2d Cir. 2001). The *Finley* court held that § 924(c) "does not clearly manifest an intention to punish a defendant twice for continuous possession of a firearm in furtherance of simultaneous predicate offenses consisting of virtually the same conduct." *Id.* at 207.

In response, the government asserts that "the unit of charge [for § 924(c)] is each individual motor vehicle" and, therefore, "Jackson's argument fails because he was properly charged with and convicted of committing two separate carjackings." (Gov't Br. 50–51.) The government relies on *United States v. Chapman*, which held that "the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode [is] lawful." 551 F. App'x 850, 853 (6th Cir. 2014).

**1.  Standard of Review and Applicable Law**

In relevant part, § 924(c)(1)(A) mandates the imposition of a five-year mandatory minimum sentence on "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." If the defendant brandished the firearm, that mandatory minimum sentence increases to seven years. *See* 18 U.S.C. § 924(c)(1)(A)(ii). Where a defendant is convicted of a "second or subsequent" violation of § 924(c), the mandatory minimum sentence increases to 25 years. *See* 18 U.S.C. § 924(c)(1)(C)(i). Section 924(c)(1)(D)(ii) further states that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other

term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed."

We review the imposition of consecutive sentences under 18 U.S.C. § 924(c) de novo. *United States v. Langan*, 263 F.3d 613, 627 (6th Cir. 2001). Likewise, we review de novo Jackson's argument that he was entitled to acquittal on the second § 924(c) conviction because insufficient evidence supported the charge. *See United States v. Taylor*, 800 F.3d 701, 711 (6th Cir. 2015).

The government and the district court below both relied on *Chapman*, an unpublished decision upholding multiple § 924(c) convictions—and a 2580-month sentence—for a defendant who, after committing two shootings, at two different houses, was convicted of eight counts each of attempted murder, assault, and violation of § 924(c): one count for each occupant of the two houses. 551 F. App'x at 852. This court upheld the convictions and sentences, finding that "§ 924(c) requires consecutive sentences for separate § 924(c) convictions even when the underlying crimes 'occur in rapid succession or in the course of one crime spree.'" *Id.* at 853 (quoting *United States v. Simpson*, 116 F. App'x 736, 740 (6th Cir. 2004)).

Before discussing Jackson's argument, we summarize a handful of additional relevant cases not discussed in depth by either Jackson or the government.

### a. *United States v. Vichitvongsa*

In *Vichitvongsa*, we considered "whether a defendant can be convicted of violating § 924(c) twice on the sole basis of using the same firearm *one* time to simultaneously further *two* different conspiracies." *United States v. Vichitvongsa*, 819 F.3d 260, 266 (6th Cir.), *cert. denied*, 137 S. Ct. 79 (2016). The convictions in *Vichitvongsa* stemmed from two separate armed robberies of drug dealers. *Id.* at 264. For each robbery, the defendant was convicted of one count of conspiracy to commit Hobbs Act robbery, one count of conspiracy to traffic drugs, and *two* violations of § 924(c). *Id.* The defendant was thus convicted of four § 924(c) convictions.

The *Vichitvongsa* court began by discussing *Roy Lee Johnson* and noting that the "rationale of [*Roy Lee*] *Johnson* applies to the instant case." *Id.* at 267. Just as

> [*Roy Lee*] *Johnson* took *one* affirmative firearm act (possessing guns) while simultaneously committing *two* predicate offenses (possessing two controlled substances), and this was not enough to substantiate two § 924(c) convictions, . . . Vichitvongsa took *one* affirmative firearm act (brandishing a handgun) while simultaneously committing *two* predicate offenses (conspiring to commit Hobbs Act robbery and to traffic drugs), and this does not support two § 924(c) convictions.

*Id.* at 267 (emphasis in original).

The *Vichitvongsa* court acknowledged *Taylor*'s statement that "924(c)'s unit of prosecution is the underlying offense, not the number of firearms." *Id.* at 268. The court explained, however, that *Roy Lee Johnson* had refined that statement: courts are required to "look not to the number of firearms, but rather to the facts and circumstances driving the underlying offense." *Id.* The court therefore clarified that, "courts must look both at the offense upon which a § 924(c) charge rests and § 924(c)'s express language linking a firearm to the predicate offense—the defendant's use, carry, or possession." *Id.* at 268–69 (emphasis in original). So, in "order for the government to convict a defendant of more than one § 924(c) charge, the defendant must use, carry, or possess a firearm . . . more than once." *Id.* at 269.

The *Vichitvongsa* court "emphasize[d] the narrowness" of its decision, noting that it did "not hold that multiple crimes with one firearm occurring during 'the same criminal episode' may support only one § 924(c) charge." *Id.* at 269. "Whether a criminal episode contains more than one unique and independent use, carry, or possession depends at least in part on whether the defendant made more than one choice to use, carry, or possess a firearm." *Id.* at 270. Finding that Vichitvongsa only made one choice to use, carry, or possess a firearm for each robbery, the court vacated two of Vichitvongsa's § 924(c) convictions. *Id.* The *Vichitvongsa* court explicitly distinguished its holding from our earlier holdings in *Burnette*, *Graham,* and *Nabors*, noting that those cases stand for the rule that multiple underlying offenses can support multiple § 924(c) convictions where each underlying offense has different elements, but found that those cases are distinguishable because, in each case, "whether there was more than one use, carry, or possession was not at issue." *Id.* at 268. We briefly summarize those three cases.

### i. United States v. Nabors

In *Nabors*, the defendant used a rifle to shoot a federal agent who was executing a search warrant at his residence. *United States v. Nabors*, 901 F.2d 1351, 1353 (6th Cir. 1990). The search produced the rifle Nabors had fired at the agent as well as crack cocaine and another firearm. *Id.* Nabors was convicted of one count of possession of controlled substances with the intent to distribute, one count of assault, and two § 924(c) counts: one predicated on each of the underlying offenses. *Id.* at 1353–54. On appeal, we affirmed the § 924(c) convictions, finding that the underlying offenses were "distinct and require[d] proof of facts not required by the other predicate." *Id.* at 1358. The court specifically found that Nabors not only used a firearm to shoot the federal agent, but also "to facilitate and protect drug transactions" and considered the firearms "to have been used during and in relation to the drug trafficking offense." *Id.*

### ii. United States v. Burnette

The defendant in *Burnette* used a firearm to kidnap a bank manager and her family and, the following day, used a firearm to coerce the bank manager to assist him in robbing a bank. *United States v. Burnette*, 170 F.3d 567, 568 (6th Cir. 1999). Burnette was convicted of two separate § 924(c) charges: one predicated on the kidnapping and one predicated on the bank robbery. *Id.* at 571–72. We affirmed those convictions, noting that "the kidnapping occurred significantly before, and independent of, the actual bank robbery, rather than being in any way simultaneous." *Id.* at 572. We also affirmed the imposition of consecutive sentences for those two § 924(c) convictions, stating that it was "firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode [is] lawful." *Id.* (collecting cases).

### iii. United States v. Graham

The defendant in *Graham* carried a firearm while guarding his illegal marijuana farm and possessed a number of other firearms in connection with his membership in a militia group. *United States v. Graham*, 275 F.3d 490, 496–97 (6th Cir. 2001). As part of his militia activities, Graham plotted an attack on the federal government. *Id.* at 497–98. Graham was subsequently convicted of drug trafficking, conspiring to commit crimes against the United States, and two

violations of § 924(c): one predicated on each of the underlying offenses. *Id.* at 499–500. On appeal, the court relied on *Burnette* and upheld the separate § 924(c) convictions, holding that "Graham's predicate offenses were not committed simultaneously, nor did they consist of identical conduct." *Id.* at 520–21.

**b. *United States v. Rentz***

In *Rentz*, the Tenth Circuit sitting en banc held that the act of firing a single gunshot that wounded one victim and killed another—and was therefore sufficient to convict the defendant of both assault and murder—could not support two separate § 924(c) convictions. *See United States v. Rentz*, 777 F.3d 1105, 1107, 1114 (10th Cir. 2015) (en banc). In so finding, the Tenth Circuit engaged in an in-depth textual and grammatical analysis of § 924(c). *See id.* at 1109. The court noted that § 924(c) contains three operative verbs: "uses," "carries," and "possesses." *Id.* The court found that the structure of § 924(c) "suggest[s] that every new conviction requires a new act falling into one of those three categories": using, carrying, or possessing a firearm. *Id.* And, since § 924(c) requires that the firearm be used or carried "during and in relation to any crime of violence or drug trafficking crime," or possessed "in furtherance of any such crime," the court concluded each § 924(c) charge "must involve *both* an act of using, carrying, or possessing *and* that such an act must come during and in relation to (or in furtherance of) a qualifying crime." *Id.* at 1109–10 (emphasis in original). The Tenth Circuit thus held that only a single § 924(c) conviction was appropriate where a defendant used, carried, or possessed a firearm once.

**2. Discussion**

As we noted at the outset, Jackson appears to conflate two separate arguments: that the court should have imposed concurrent sentences on his two § 924(c) convictions and that the evidence was sufficient only to support a single conviction. Jackson's first argument is squarely foreclosed both by the language of the statute and by our case law. *See* 18 U.S.C. § 924(c)(1)(D)(ii) ("[N]o term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person . . . ."); *Burnette*, 170 F.3d at 572 ("It is now firmly established that the imposition of separate consecutive sentences for multiple § 924(c) violations occurring during the same criminal episode [is]

lawful."). If this were Jackson's only argument, he would lose. For the reasons that follow, however, the evidence at trial was sufficient to support only a single § 924(c) conviction and we therefore vacate one of Jackson's § 924(c) convictions.

We first note that the facts of *Chapman* are not clear, and the defendant in *Chapman* never claimed that he used, carried, or possessed his gun only once. In addition to a Double Jeopardy argument, Chapman claimed only that § 924(c) "allow[ed] the district court to impose concurrent sentences for *related* § 924(c) convictions." 551 F. App'x at 852 (emphasis added). In any event, our published opinion in *Vichitvongsa* controls. We thus consider whether the evidence supports a finding that Jackson used, carried, or possessed a firearm more than once in connection with the double carjackings. Both victims of the Corolla carjackings, G.B. and Z.N., testified that two persons simultaneously approached them, each waving a gun in the air. The victims testified that the assailants put guns to the back of their heads, but both G.B. and Z.N. suggested that each assailant focused on one victim—one assailant put a gun to G.B.'s head, and one assailant put a gun to Z.N.'s head. Thus, the record supports that just as in *Vichitvongsa*, Jackson's two § 924(c) convictions were premised on his use of "the same firearm *one* time to simultaneously further *two* different" criminal acts. *Vichitvongsa*, 819 F.3d at 266.

Jackson made only a single choice to "use, carry, or possess" a firearm and, as we made clear in *Vichitvongsa*, a defendant must make "more than one choice to use, carry, or possess a firearm" in order to be convicted of more than one § 924(c) offense. *Id.* at 270. The evidence concerning the double carjacking is therefore sufficient to support only a single § 924(c) conviction.

In a letter filed after oral argument, the government notes that the *Vichitvongsa* court emphasized the narrowness of its holding. But, *Vichitvongsa* specified only that its holding did not apply to situations where multiple § 924(c) convictions are predicated on separate offenses that occurred as part of "the same criminal episode." *See Vichitvongsa*, 819 F.3d at 269–70. To illustrate this point, the court cited *Nabors*, *Burnette*, and *Graham* as situations where the evidence supported multiple § 924(c) convictions because the criminal episodes in those cases "contain[ed] more than one unique and independent use, carry, or possession," a determination that "depends at least in part on whether the defendant made more than one choice to use, carry,

or possess a firearm." *Id.* at 270. Because the defendant in *Burnette* kidnapped a bank manager and her family, held them overnight, and then coerced the bank manager into assisting him in robbing a bank, the criminal episode contained at least two separate choices to use, carry, or possess a firearm. *See Burnette*, 170 F.3d at 568–72. Likewise, the defendant's conduct in *Graham*—carrying a firearm while tending to illegal marijuana farms and while plotting to attack federal officials—was sufficient to support two § 924(c) charges because the "predicate offenses were not committed simultaneously, nor did they consist of identical conduct." *Graham*, 275 F.3d at 521. The same is true in *Nabors*, where the defendant's two § 924(c) convictions were predicated on convictions for possession of controlled substances and for assault. *See Nabors*, 901 F.2d at 1353.

Here, in contrast, Jackson and Taylor committed two simultaneous carjackings. Like the defendants in *Vichitvongsa* and *Rentz*—and unlike the defendants in *Nabors*, *Burnette*, and *Graham*—the record supports that Jackson made a single choice to use a firearm. He therefore can only be convicted of a single § 924(c) charge. As in *Vichitvongsa*, we again emphasize the narrowness of our holding. We do not hold that one "criminal episode" or "transaction" cannot support multiple § 924(c) convictions. For example, we need not determine here whether two § 924(c) charges might have been sustained if Jackson had first placed a gun to G.B's head and then to Z.N.'s head—those facts are not before us.

The government argues that *Vichitvongsa* is distinguishable because "[n]ot only did Jackson use and brandish a firearm during the two July 26 carjackings, but Taylor did, as well." (Aug. 1 Gov't 28(j) at 1.) That is, the government now argues that Jackson's and Taylor's uses of firearms "were separate, unique, and independent uses of firearms during the two robberies of the two victims" supporting two convictions because "Jackson brandished his firearm, and aided and abetted Taylor's brandishing, as well." (*Id.* at 1–2.) But the government did not advance its aiding-and-abetting theory until after oral argument, in a Fed. R. App. P. 28(j) letter, so we consider it forfeited. *See United States v. Goldston*, 906 F.3d 390, 395 n.1 (6th Cir. 2018) (clarifying that the defendant forfeited an argument when he failed to raise it "prior to oral argument"); *GGNSC Springfield LLC v. NLRB*, 721 F.3d 403, 406–07 (6th Cir. 2013) (noting

that the court was not compelled to consider a non-jurisdictional argument raised for the first time in a Fed. R. App. P. 28(j) letter).**7**

Because Jackson made a single choice to "use, carry, or possess" a firearm in connection with the simultaneous carjackings, he cannot be convicted of two separate violations of § 924(c) as a principal.  We therefore vacate Jackson's conviction on Count 11 and remand for resentencing.

### G.  We Do Not Consider the Substantive Reasonableness of Jackson's Sentence

Jackson also argues that his sentence was substantively unreasonable.  Because we remand for resentencing, we do not reach Jackson's argument on this point.

### III.  Conclusion

Jackson's conviction for violation of § 924(c) under Count 11 is **VACATED** and we remand for resentencing.  The remainder of Jackson's convictions, as well as Palmer's convictions and sentence, are **AFFIRMED**.

---

**7**We note that although the government is correct that an indictment need not specifically charge aiding-and-abetting liability in order to support a valid jury verdict premised on such a theory, *see United States v. McGee*, 529 F.3d 691, 695 (6th Cir. 2008), there is no indication that the jury relied on an aiding-and-abetting theory in convicting Jackson on one of the § 924(c) charges. The government argued such a theory with respect to Palmer's criminal liability, and the jury was instructed on aiding-and-abetting liability and given a verdict form specifically setting forth aiding and abetting as an alternative theory with respect to Palmer.  However, aiding and abetting was not argued, instructed upon, or presented as a verdict option in regard to Jackson.  Some circuits have refused to sustain a conviction on an aiding-and-abetting theory that was not submitted to the jury. *See, e.g., United States v. Chavira*, 209 F.3d 720, at *5 n.8 (5th Cir. 2000) ("The government argues that . . . [the defendant]'s conviction can be sustained on a theory of aiding and abetting. Because the court did not instruct the jury on aiding and abetting, this contention is incorrect."); *United States v. Brito*, 136 F.3d 397, 410 n.18 (5th Cir. 1998) (same); *United States v. Medina*, 755 F.2d 1269, 1279 (7th Cir. 1985) ("The fatal flaw in the government's position is that an aiding-and-abetting instruction was not given in this case. . . . We are unwilling to uphold [the defendant]'s conviction on a theory that was not argued to the jury and on which it was not instructed."); *cf. United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984) ("[T]he accused can be convicted of aiding and abetting so long as the jury is instructed on it."). Another has held that this rule did not survive the Supreme Court's holding in *Neder v. United States*, 527 U.S. 1 (1999). *See United States v. Abozid*, 257 F.3d 191, 199–200 (2d Cir. 2001); *see also Napper v. United States*, 22 A.3d 758, 770 n.18 (D.C. 2011).  Because the government forfeited reliance on an aiding-and-abetting theory, we need not further address the issue.