RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0002p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

$\qquad$ *Plaintiff-Appellee*,

*v.*

KEVIN LOREN DANIELS,

$\qquad$ *Defendant-Appellant*.

> No. 24-3260

─────────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:21-cr-00239-1—Michael H. Watson, District Judge.

Argued: June 11, 2025

Decided and Filed: January 7, 2026

Before: WHITE, LARSEN, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Dennis Belli, Columbus, Ohio, for Appellant. Mary Beth Young, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee. **ON BRIEF:** Dennis Belli, Columbus, Ohio, for Appellant. Mary Beth Young, Kimberly Robinson, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.

MURPHY, J., delivered the opinion of the court in which LARSEN, J., concurred. WHITE, J. (pp. 30–31), delivered a separate opinion concurring in part and dissenting in part.

─────────────────

## OPINION

─────────────────

MURPHY, Circuit Judge. After Kevin Daniels committed an armed robbery, a jury convicted him of robbery and firearm offenses. The district court sentenced him to 181 months'

imprisonment.  Daniels now raises eight issues on appeal.  He claims that his convictions rest on constitutional, evidentiary, and instructional errors.  And he claims that his sentence rests on mistaken guidelines calculations.  Neither set of claims has merit.  We thus affirm.

I.

Stores typically bustle with customers searching for deals on the day after Thanksgiving, which eventually became known as "Black Friday" as a result.  Around 7:40 p.m. on that day back in 2021, things had quieted down at the T-Mobile store on High Street in Columbus, Ohio. Two employees were operating the store.  When one tried to slip out for a cigarette break, she heard the door beep that signals a customer's entry.  So she returned to the floor and encountered a man wearing a black hoodie and blue face mask.

After she greeted the man, he responded with the command to "give [him] all [the] fucking phones."  Trial Tr., R.116, PageID 727.  He "pulled out a gun," pointed it at the two employees, and forced them into the backroom.  *Id.*  When they got there, the robber ordered one of the employees to remove phones out of the phone safe and to place them in bags that he provided.  In the meantime, he ordered the other employee to empty the money safe.  The portion of this safe that employees can open contained only $500.  The robber became "very angry" when he learned that only armed truck drivers can open the part of the safe with more money. *Id.*, PageID 731.  The employee "feared for" her safety at this point because he got "scary."  *Id.*, PageID 738.  The robber next turned to a second phone safe and asked the employees to open it. But this safe had a "ten-minute delay" before it would open.  *Id.*, PageID 727.  The robber refused to wait that long.  Instead, he sprayed mace in both employees' faces.  He then fled out the back door.  Once the employees recovered from the macing, they called 911.

Unbeknownst to the robber, an employee had placed a "bait phone" in one of the bags of stolen phones.  *Id.*, PageID 729.  This phone contained a GPS tracker that activated the moment the employee removed it from the safe.  It alerted a third-party tracking company, and the company transmitted the bait phone's GPS coordinates to the Columbus Police Department. Dispatch quickly alerted nearby police officers of the robbery and sent "updated pings" showing the bait phone's evolving location.  *Id.*, PageID 763.

A police helicopter soon located the vehicle with the bait phone and put a spotlight on it. Officers on the ground identified this vehicle and tried to pull it over. But the driver "took off at [a] high rate of speed" away from them. *Id.*, PageID 766. The helicopter continued to monitor the vehicle as it raced through the streets. Officers on the ground tried a "pit maneuver" to get the driver to spin out, but it did not work. *Id.*, PageID 767–68. They then followed the vehicle into an alley. While there, the driver slowed down and jumped out of the moving vehicle. The officers chased him on foot and arrested him in the backyard of a nearby home. At this time, the driver asked the officers how they had managed to catch him so fast and opined that there must have been transmitters in the bags. He also identified himself as "Kevin Daniels." *Id.*, PageID 782.

The officers arrested Daniels and took him to the police station. He waived his right to remain silent and spoke to them there. Daniels eventually made statements suggesting that he committed the robbery. He claimed, for example, that he robbed the store because he needed the money to pay bills. And he suggested that the officers had "caught" him "red-handed." Trial Tr., R.118, PageID 1039.

Officers also impounded Daniels's vehicle and obtained a warrant to search it. They recovered (among other things) a loaded handgun, mace, bags filled with the phones stolen from the store, cash in an amount stolen from the store, a black hooded sweatshirt, and a blue mask.

The government obtained a three-count indictment against Daniels. It charged him with affecting interstate commerce through a robbery (or "Hobbs Act robbery"). *See* 18 U.S.C. § 1951(a). It charged him with brandishing a firearm during a crime of violence. *See id.* § 924(c)(1)(A)(ii). And it charged him with illegally possessing that firearm as a felon. *See id.* § 922(g)(1).

Daniels stood trial. The jury convicted him on all counts. For the robbery and felon-in-possession convictions, the district court calculated Daniels's guidelines range as 78 to 97 months' imprisonment. It sentenced him to 97 months' imprisonment on these counts. The court next found that the count for brandishing a firearm during a crime of violence triggered a

mandatory-minimum 7-year sentence.  The court chose that minimum.  It thus sentenced Daniels to a total of 181 months.

## II. Challenges to Convictions

Daniels raises two constitutional challenges, one evidentiary challenge, and one instructional challenge to his convictions.  None of these challenges has merit.

### A. *Miranda* Waiver

Daniels first moved to suppress his statements at the police station on the ground that he did not knowingly waive his right to remain silent.  The district court rightly rejected this motion.

#### 1.

We start with the facts.  Officers placed Daniels in an interrogation room around 10:20 p.m. on the night of the robbery.  While sitting alone in this room, Daniels sneezed several times. An officer entered to ask if he was sick.  He responded no and added that he had ingested cocaine earlier.  Two detectives then entered to interrogate him.

At first, the detectives discussed Daniels's rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  They gave him a form with these rights written on it and asked if he had seen such a form before.  Daniels replied that he knew "the whole process" and that he could "understand" the form.  Video Ex. at 12:02–:05, 12:28.  After questioning about his recent drug use, he noted that he had taken about "half a gram" of cocaine.  *Id*. at 12:39–:44.  But he answered "no" when asked if he might have a "medical episode" or the like.  *Id.* at 12:50–:54.  At this point, a detective read Daniels his rights while Daniels looked over the form.  Daniels then read a sentence out loud: "I have read the statement of my rights as written above.  I understand my rights."  *Id.* at 13:35–:43.  But he refused to sign the form because "it's all on camera" anyway. *Id.* at 13:52–14:01.

The detectives went on to question Daniels about the robbery.  When asked why he committed the crime, he said he had "some bills" to pay.  *Id.* at 14:30–:50.  And when asked why he maced the women, he said he was "just trying to think how [he] can maybe get away."  *Id.* at 16:40–:50.  He further noted that he had been "scared" and "had to do drugs just to calm

down[.]" *Id.* at 16:54–:59. In response to a detective's suggestion that they wanted to know the details, he opined that he was "on drugs" and "down on [his] luck." *Id.* at 17:40–:45.

The detectives later switched to questioning Daniels about whether he had committed nine similar robberies in which the robber maced the victims. Daniels responded that he was not pictured in the photo of a suspect who had committed one of these robberies. He also conveyed that he had not robbed anyone in a long time before that night and that he was "fucked up, man." *Id.* at 20:33–:39. After asking one of the detectives to leave, he told the other one "don't do this to me" and reiterated that he had not committed the other robberies. *Id.* at 23:28–:45. He added: "You know what I did tonight" because it was "on camera" so he did not have to explain it. *Id.* at 25:22–:33. Daniels also suggested that they should not charge him with the other robberies because it took him substantial courage to commit this one. He claimed that he had been praying about it and that he was "so fucked up right now trying to help [his] goddamn family." *Id.* at 26:52–27:03. Eventually, he told the remaining detective that he was "done" answering questions. *Id.* at 27:32–:33. This detective immediately ended the interrogation.

Before trial, Daniels moved to suppress his statements during this interrogation. He argued that he did not knowingly waive his *Miranda* rights because he was high on cocaine. At a hearing, one of the detectives testified that Daniels had shown no signs of impairment, such as a "slurring of his speech" or "glassy eyes." Suppression Tr., R.114, PageID 590–91. The district court agreed. It found that the detectives had no "reason" to believe that Daniels was intoxicated because he "acted perfectly normal," "did not slur his speech," and did not "display any problems with balance." Order, R.50, PageID 132–33. Daniels also "answered all of the questions coherently, cogently, and concisely." *Id.*, PageID 133. The court thus denied this motion.

2.

The Fifth Amendment bars the federal government from "compell[ing]" "any person" "in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In *Miranda*, the Court sought to protect this right by adopting "judicial rules of the road" that police officers must follow during custodial interrogations of criminal suspects. *United States v. Potter*, 927 F.3d

446, 449 (6th Cir. 2019); *see Miranda*, 384 U.S. at 478–79. These rules require officers to inform suspects of several things, including their right to remain silent and to have an attorney. *See Moran v. Burbine*, 475 U.S. 412, 420 (1986). And the rules require suspects to knowingly and voluntarily waive these rights. *See Maryland v. Shatzer*, 559 U.S. 98, 104 (2010). If officers obtain incriminating statements from a suspect while violating these rules, courts must exclude the statements from any later criminal trial. *See Vega v. Tekoh*, 597 U.S. 134, 141–42 (2022).

This case involves the rules for a valid waiver of the rights that *Miranda* requires officers to disclose (the right to remain silent and to counsel). The Supreme Court evaluates a suspect's waiver across "two distinct dimensions." *Moran*, 475 U.S. at 421. To start, suspects must "voluntarily" waive the rights. *Id.* (citation omitted). This requirement ensures that officers do not coerce a waiver out of suspects or deceive them to obtain it. *Id.*; *see United States v. Mahan*, 190 F.3d 416, 422–23 (6th Cir. 1999). Next, suspects must "knowingly" waive the rights. *Moran*, 475 U.S. at 421 (quoting *Miranda*, 384 U.S. at 444). This requirement ensures that suspects know of both the "nature" of the abandoned rights and the "consequences" of waiving them. *Id.* Yet suspects need not understand "every possible consequence" of speaking to the police. *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (en banc) (quoting *Colorado v. Spring*, 479 U.S. 564, 574 (1987)). They must know just the basics: that they have the right not to talk to the police, to talk only with counsel present, and to discontinue talking at any time. *See Spring*, 479 U.S. at 574. And they must know of the main consequence of speaking: that the police may use their statements against them. *See id.*; *United States v. Crumpton*, 824 F.3d 593, 607–08 (6th Cir. 2016).

The Supreme Court has established several other subsidiary ground rules for establishing whether a suspect's waiver passes muster. Suspects need not *expressly* waive their *Miranda* rights (whether orally or in writing). *See Berghuis v. Thompkins*, 560 U.S. 370, 383–84 (2010). Rather, they can *impliedly* waive the rights by, for example, speaking with the officers after the officers have made the required disclosures. *See id.* at 383–85. The Court also requires us to consider the "totality of the circumstances" to decide whether a suspect knowingly and voluntarily gave up the right to remain silent and to have an attorney. *Fare v. Michael C.*, 442

U.S. 707, 725 (1979); *see Arizona v. Fulminante*, 499 U.S. 279, 285–89 (1991). And the government bears the burden to show these two elements. *See Berghuis*, 560 U.S. at 384.

When reviewing a district court's conclusion that suspects knowingly and voluntarily waived their *Miranda* rights, we must defer to that court's factual findings and can overturn them only if the court committed clear error. *See United States v. Williams*, 998 F.3d 716, 737 (6th Cir. 2021). Yet we review the district court's legal analysis about the requirements for a valid waiver de novo. *See id.* How about the mixed (or ultimate) question whether a suspect entered a knowing and voluntary waiver under the totality of the historical facts found by the district court? We must review the ultimate *voluntariness* finding de novo. *See Beckwith v. United States*, 425 U.S. 341, 347–48 (1976); *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir. 1991). Some courts, on the other hand, review the ultimate *knowing* question for clear error. *See United States v. Price*, 980 F.3d 1211, 1226 (9th Cir. 2019). The parties point us to none of our own caselaw on this topic. So we will save it for another day because Daniels's claim fails under any standard of review.

Daniels entered a knowing and voluntary waiver. As for the voluntary nature of the waiver, no evidence suggests that the detectives tried to coerce or deceive him to obtain it. *See Berghuis*, 560 U.S. at 382–83. To the contrary, they calmly read him his rights and clarified that he could remain silent and end the questioning at any time. Video Ex. at 13:00–:30. Daniels thus identifies no "police coercion" of any kind. *Mahan*, 190 F.3d at 422. As for the knowing nature of the waiver, Daniels told the detectives that he understood "the whole process" when they handed him a form listing his rights. Video Ex. at 12:00–:07. He then looked over the form (which he also said he understood) while a detective explained his rights to him. And he read aloud from the form, acknowledging that he had "read the statement of [his] rights" and understood it. *Id.* at 13:35–:43. The detectives also told him about the consequences of the waiver: "anything [that he said could] be used against [him] in court." *Id.* at 13:08–:10. And his ultimate decision to end the conversation further confirmed that he knew he could stop talking at any time. *Id.* at 27:32–:34.

Daniels's two counterarguments fail to persuade us otherwise. *First*, he notes that he had ingested cocaine before the robbery and interrogation. We have "frequently" confronted claims

that intoxicated suspects did not knowingly waive their *Miranda* rights. *United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010). And we treat a suspect's prior drug or alcohol use as one factor in the totality of the circumstances. *United States v. Washington*, 2022 WL 1224553, at *3 (6th Cir. Apr. 26, 2022) (citing *Montgomery*, 621 F.3d at 572–73). So when suspects appear "alert, coherent, and lucid" despite their prior use of an intoxicating substance, we have regularly upheld a finding that they made a knowing waiver. *Id.*; *see United States v. Hayek*, 2024 WL 2028048, at *3 (6th Cir. May 7, 2024); *United States v. Davis*, 683 F. App'x 480, 484 (6th Cir. 2017); *United States v. Hampton*, 572 F. App'x 430, 434–35 (6th Cir. 2014); *Montgomery*, 621 F.3d at 574; *United States v. Dunn*, 269 F. App'x 567, 572–73 (6th Cir. 2008). This case requires the same result. Although Daniels stated that he had used cocaine, he told the detectives that he was not experiencing any type of episode from it. And, as the district court found, he showed no signs of impairment that might suggest he lacked the required understanding of what he was waiving. Rather, he "acted perfectly normal" and "answered all of the questions coherently, cogently, and concisely." Order, R.50, PageID 132–33.

Daniels responds that the detectives should have known that he was intoxicated because he twice told them that he was "fucked up" during the interrogation. Video Ex. at 20:36–:37, 26:59–27:00. But the officers understood him to be talking about the circumstances in which he found himself (caught red-handed committing an armed robbery) rather than his mental acuity. Supp. Tr., R.114, PageID 595. And the district court credited the detectives' understanding. Order, R.50, PageID 134. We must accept its "credibility determination" under our deferential standard of review for factual findings. *Dunn*, 269 F. App'x at 573. These statements thus do nothing to undermine the conclusion that Daniels's prior cocaine use did not affect his waiver.

*Second*, Daniels notes that he refused to sign the rights-waiver form. As the Supreme Court made clear in *Berghuis*, however, suspects can validly waive their rights even when they "decline[] to sign" such a form. 560 U.S. at 375, 384–85; *see United States v. Lawrence*, 735 F.3d 385, 437–38 (6th Cir. 2013). In that case, the suspect engaged in a "course of conduct indicating waiver" by answering the officers' questions after receiving the *Miranda* warnings. *Berghuis*, 560 U.S. at 386 (citation omitted). Daniels followed the same course of conduct. If anything, this case is easier. The record in *Berghuis* contained conflicting evidence over whether

the suspect had *verbally* stated that he understood his rights. *Id.* at 375. All agree, by contrast, that Daniels conveyed this understanding to the detectives. And when he refused to sign the form, he explained that they had recorded "on camera" his statements indicating that he understood his rights. Video Ex. at 13:57–:59. All told, the totality of the circumstances—including Daniels's verbal waiver, demeanor, and rapport—establishes that he knowingly and intelligently waived his *Miranda* rights.

## B. Right to Counsel

Daniels next argues that the district court violated the Sixth Amendment by denying his request for new counsel. This second constitutional claim fares no better.

We again start with the facts. A week or so before trial, Daniels sent the district court a handwritten letter requesting a new attorney. He complained that his existing lawyer did not "review" certain "documents" with him and that he had trouble contacting this lawyer. Letter, R.58, PageID 196. He also stated that he asked his lawyer to challenge certain evidence, and his lawyer had not complied. *Id.* The district court brought up the letter at the final pretrial conference. The court went over the identified documents (a sealed version of the indictment and a case information sheet). Daniels then suggested that he had asked his attorney to obtain DNA testing for the firearm recovered from his vehicle after the high-speed chase, but his attorney "shrugged it off" and declined the request. Pretrial Tr., R.121, PageID 1162. The court asked the government about the DNA testing. It responded that it had not tested the gun because it had overwhelming evidence of Daniels's guilt. And although Daniels then suggested that he and his attorney had suffered a "breakdown in communication," the court refused to appoint new counsel. *Id.*, PageID 1163. It had granted Daniels a new attorney once before and assured him that he had "competent counsel" (a former U.S. Attorney) representing him. *Id.*, PageID 1164. The district court thus saw no "legitimate reason" for a last-minute change. *Id.* We review this decision for an abuse of discretion. *See United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009).

We see no such abuse. The Sixth Amendment gives "the accused" in "all criminal prosecutions" "the right . . . to have the Assistance of Counsel for his defence." U.S. Const.

amend. VI.  The Supreme Court has interpreted this right to require courts to appoint a lawyer for defendants who cannot afford to pay for their own counsel.  *Gideon v. Wainwright*, 372 U.S. 335, 339–40 (1963).  But a defendant's right to *publicly appointed* counsel differs from the defendant's right to *privately retained* counsel.  *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 151–52 (2006).  Indigent defendants who obtain appointed counsel have no right to choose any specific attorney.  *See United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990).  Nevertheless, the statute authorizing the appointment of counsel permits a court to substitute one attorney for another when "the interests of justice" support the substitution.  18 U.S.C. § 3006A(c); *see Martel v. Clair*, 565 U.S. 648, 658 (2012).  So we have held that defendants must show "good cause" when they seek a new attorney.  *Iles*, 906 F.2d at 1130.

When a defendant complains about appointed counsel, a district court should inquire into the reasons for the defendant's concerns to determine if this good cause exists.  *Vasquez*, 560 F.3d at 466.  On appeal, we ask four questions to decide whether a district court reasonably found that a defendant lacked good cause.  *See United States v. Wells*, 55 F.4th 1086, 1090–91 (6th Cir. 2022); *United States v. Jennings*, 83 F.3d 145, 148 (6th Cir. 1996).  First: Did the defendant timely seek a new attorney?  *See United States v. Trevino*, 7 F.4th 414, 428 (6th Cir. 2021).  Second: Did the district court adequately investigate the issue?  *See id.*  Third: How severe was the attorney-client conflict?  *See id.*  And fourth: How would a change affect the public interest?  *See id.*

The district court's denial of Daniels's request reasonably balanced these four factors.  For starters, Daniels did not act promptly.  We regularly uphold the denial of a request for a new attorney when that request comes shortly before trial.  *See id.* at 429 (collecting cases).  Here, Daniels sent his request just ten days before trial, and the district court did not receive it until five days before.  Because the request would have required the court to continue the trial, we must give "extraordinary deference" to its refusal to do so.  *Vasquez*, 560 F.3d at 467 (citation omitted); *see United States v. Sharp*, 2023 WL 3966739, at *6 (6th Cir. June 13, 2023).  Daniels also failed to explain why he did not seek a new lawyer earlier.  By the time of his request, his attorney had represented him for ten months.  And Daniels objected to his attorney's failure to obtain certain documents (the sealed indictment and case information sheet) that had been on the

docket since the case's start.  *See United States v. Chambers*, 441 F.3d 438, 447 (6th Cir. 2006).  Similarly, counsel's failure to seek the DNA evidence would have been obvious throughout the case.  *See Martel*, 565 U.S. at 665.  Yet Daniels offers no reason for the delay.

Next, the district court conducted a sufficient, if limited, investigation into Daniels's motion.  We require a district court to give the defendant a chance "to explain the attorney-client conflict as he perceives it."  *United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011).  When the district court has failed to do so, then, we have sometimes remanded to allow the defendants to explain their reasons.  *See United States v. Jennings*, 945 F.2d 129, 132 (6th Cir. 1991), *opinion clarified*, 966 F.2d 184 (6th Cir. 1992).  At the final pretrial conference here, the district court allowed Daniels to list all his concerns with his lawyer.  The court also explained why the documents mentioned in his letter did not affect his case.  The court thus sought "to ease [Daniels's] distrust" with his counsel's failure to turn over the allegedly secret documents.  *Iles*, 906 F.2d at 1131.  It next allowed Daniels to air a new concern: that his attorney did not seek DNA testing.  And it allowed him to discuss their alleged lack of communication.  The court perhaps should have asked follow-up questions when Daniels suggested that he and his lawyer had suffered a breakdown in communication.  But given the other factors, and especially the timing of Daniels's request, that alone does not qualify as reversible error.  *See United States v. Zamora*, 2025 WL 3476178, at *6–7 (6th Cir. Dec. 3, 2025).

The court also reasonably concluded that the conflict between Daniels and his attorney was not so severe as to warrant a substitution of counsel.  We are more likely to require attorney substitution when a "total lack of communication" will prevent the defendant from raising "an adequate defense[.]"  *United States v. Mack*, 258 F.3d 548, 556 (6th Cir. 2001).  This type of breakdown did not occur here.  Although Daniels told the district court that their communication had stopped, the transcript paints a different picture.  Among other things, defense counsel knew the documents that Daniels wanted to see—showing that they had communicated.  Daniels's attorney also mentioned that they planned to speak later that week about the trial.  Nor did any lack of communication undermine counsel's ability to assert an "adequate defense" at trial.  *Id.*  To the contrary, counsel presented a viable defense (by suggesting that someone else might have robbed the store and given Daniels the loot) despite the overwhelming evidence against Daniels.

Lastly, the public interest did not support any substitution.  *See Wells*, 55 F.4th at 1092. The substitution would have delayed the trial (and justice for Daniels's victims) because new counsel would have needed more time to prepare.  *See Trevino*, 7 F.4th at 429.  And Daniels had replaced his counsel before.  *See Wells*, 55 F.4th at 1092.  He also sought a new attorney based on some "frivolous" concerns—such as the need to see a case information sheet.  *Sharp*, 2023 WL 3966739, at \*6 (quoting *United States v. Saldivar-Trujillo*, 380 F.3d 274, 278 (6th Cir. 2004)).

In response, Daniels disputes only one of these factors: the adequacy of the district court's investigation.  He complains that the court did not ask defense counsel about his strategy for declining to get DNA testing.  But this argument requires more of district courts than our cases demand.  Courts need only give defendants an opportunity to place their concerns on the record.  *See Marrero*, 651 F.3d at 465.  If we required more (such as an investigation into defense counsel's trial strategy), we would risk "intruding into privileged communications." *Iles*, 906 F.2d at 1131.  Because the court gave Daniels an adequate opportunity to air his concerns, it did not abuse its discretion in the way that it processed his request for new counsel.

## C. GPS Coordinates

Daniels next argues that the district court should have suppressed certain testimony because the government committed a discovery violation.  This third claim fails too.

The claim requires us to start with Daniels's defense strategy.  In an opening statement, defense counsel suggested that Daniels might not have robbed the T-Mobile store and instead might have obtained the stolen phones and money later.  Why?  Recall that a T-Mobile employee gave the robber a bait phone to track his getaway.  Counsel pointed out that this phone showed the robber stopped at a certain street corner for "at least one minute."  Trial Tr., R.116, PageID 721.  And he raised questions about this stop: "Was the car switched?  Was there a meet-up?" *Id.*  In other words, counsel sought to create reasonable doubt based on the theory that Daniels might have received the stolen items from the robber during an exchange at this time.

In response, a detective testified about the latitude-longitude coordinates of the bait phone during this one-minute delay.  He opined that the location data from the phone was "very

precise."  Trial Tr., R.118, PageID 1000.  He had inputted the phone's latitude-longitude coordinates into Google Maps.  And at the identified time, the phone showed the car in the "left-hand turn lane" likely stopped at a red light.  *Id.*

Daniels's counsel objected.  He argued that the detective had turned into an unauthorized "expert" witness under Federal Rule of Evidence 702 by opining on the precise location of the latitude-longitude coordinates using Google Maps.  *Id.*, PageID 998.  Counsel added that the government had not disclosed that the detective would testify as an expert or that he had engaged in this Google Maps search.  The district court overruled this objection.  But it did give the defense an option to take a continuance to test the coordinates in Google.

Daniels now raises a slightly different argument.  He suggests that the government violated Federal Rule of Criminal Procedure 16(a)(1)(F) because it did not disclose the "results" of a "scientific test or experiment" (the Google Maps search).  Appellant Br. at 13, 29 (quoting Fed. R. Crim. P. 16(a)(1)(F)).  And he claims that the district court should have suppressed the detective's testimony because of this discovery violation.  We typically review a district court's decision about pretrial discovery for an abuse of discretion.  *See United States v. Sanders*, 106 F.4th 455, 472–73 (6th Cir. 2024) (en banc); *United States v. Jordan*, 544 F.3d 656, 667 (6th Cir. 2008).  But the government points out that Daniels did not raise this Rule 16 claim in the district court.  His counsel instead objected on the ground that the detective qualified as an improper expert under Federal Rule of Evidence 702.  According to the government, Daniels forfeited his Rule 16 theory by failing to raise it with "enough specificity" in the district court.  *United States v. Holt*, 116 F.4th 599, 612 (6th Cir. 2024); *see United States v. Lester*, 98 F.4th 768, 777 n.6 (6th Cir. 2024).  It thus asks us to apply the deferential plain-error standard of review to this theory.  *See Holt*, 116 F.4th at 613.  We need not take sides in this debate because Daniels's claim fails under either standard.

Rule 16 provides that "[u]pon a defendant's request, the government must permit a defendant to inspect and to copy or photograph the results or reports . . . of any scientific test or experiment" if the defendant satisfies three factors.  Fed. R. Crim. P. 16(a)(1)(F).  The requested item must be "within the government's possession, custody, or control[.]"  Fed. R. Crim. P. 16(a)(1)(F)(i).  The government's attorney must have known (or should have known through

"due diligence") "that the item exists[.]" Fed. R. Crim. P. 16(a)(1)(F)(ii). And the item must be "material" to the defense, or the government must plan "to use the item in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(F)(iii).

Daniels's claim raises several questions on the merits. To start, the government's discovery obligations get "triggered" only if the defendant makes a "request" for the relevant items. *United States v. Dossey*, 66 F. App'x 528, 531 (6th Cir. 2003); Fed. R. Crim. P. 16(a)(1)(F). Yet Daniels points to no place in the record showing that he made such a request. *See Dossey*, 66 F. App'x at 531. Next, the rule applies only to "the results or reports" of a "scientific test or experiment" (such as a fingerprint test). Fed. R. Crim. P. 16(a)(1)(F); *see United States v. Garrison*, 839 F. App'x 968, 980 (6th Cir. 2020). Yet Daniels cites no case to support his claim that an entry of latitude and longitude coordinates into Google Maps qualifies as the type of "scientific test or experiment" that falls within this text. *Cf. Dossey*, 66 F. App'x at 531.

But we need not resolve these questions. Even if the government violated Rule 16, Daniels has not shown that the district court abused its discretion by refusing to suppress the detective's testimony. Rule 16 gives district courts "considerable" leeway in choosing a remedy for a violation of its requirements. *United States v. Maples*, 60 F.3d 244, 246 (6th Cir. 1995). A district court may order belated discovery, "grant a continuance," suppress the evidence, or impose any other "just" remedy. Fed. R. Crim. P. 16(d)(2). We have described the most severe of these remedies (suppression) as "undesirable" and reserved for cases of "incurable prejudice" or "bad faith" on the part of the prosecution. *Maples*, 60 F.3d at 247.

Here, the district court chose an alternative remedy to suppression: allowing a potential "continuance." Trial Tr., R.118, PageID 1019. The court reasonably did so. For one thing, it saw no "bad faith" on the government's part. *Maples*, 60 F.3d at 247. To the contrary, the prosecution simply did not believe that Rule 16(a)(1)(F) applied to this Google Maps search. For another thing, Daniels identifies no "incurable prejudice" from the non-disclosure. *Id.* The district court's "continuance" option gave defense counsel a chance to verify the information in Google Maps or seek a third party to do so. And counsel opted against a continuance because he could perform this task during a break. He also did not think the coordinates came back with an

"exact" location.  Trial Tr., R.118, PageID 1024.  Although Daniels rightly notes that counsel could not testify about his own results in inputting the coordinates into Google Maps, counsel got the detective to concede on cross-examination that the coordinates slightly changed during the one-minute stop.  *Id.*, PageID 1045–47.  Besides, the continuance would have allowed counsel to find a third party to testify, but counsel expressed no desire for this course of action.  Nor does Daniels identify any other information that the defense might have obtained if the prosecution had turned over the Google Map search results earlier.  In sum, the district court reasonably refused to suppress the challenged evidence because Daniels showed neither bad faith nor prejudice.

## D. Hobbs Act Instructions

This conclusion leaves Daniels's final challenge to his convictions: that the district court's instructions misinformed the jury about the Hobbs Act.  A defendant violates the Hobbs Act if the defendant "obstructs, delays, or affects commerce" through the "robbery or extortion" of another person.  18 U.S.C. § 1951(a).  When explaining this law's "commerce" element, the district court told the jury that it need not find "an actual effect on interstate commerce." Instructions, R.63, PageID 224.  Daniels asserts that this instruction conflated a completed Hobbs Act robbery (which allegedly does require such an effect) with an attempted Hobbs Act robbery (which does not).

But his argument faces a significant obstacle at the outset: Daniels failed to object to the instruction in the district court.  He thus must meet the demanding plain-error test.  *See* Fed. R. Crim. P. 30(d); *United States v. Howard*, 947 F.3d 936, 945 (6th Cir. 2020).  We have repeatedly suggested that this test in the instructional context requires a challenger to show that the jury charge, taken as a whole, was "so clearly erroneous as to likely produce a grave miscarriage of justice."  *United States v. Robinson*, 133 F.4th 712, 721 (6th Cir. 2025) (citation omitted).  Our prior cases have assumed that this language tracks the more common four-part test for plain error that the Supreme Court later adopted in *United States v. Olano*, 507 U.S. 725 (1993).  *See Robinson*, 133 F.4th at 721–22.  We may follow this assumption here too.  And under *Olano*, a defendant cannot show that jury instructions contained a plain error "unless the claimed mistake '[was] clear under current law.'"  *Id.* at 722 (quoting *Olano*, 507 U.S. at 734).

This deferential standard dooms Daniels's claim.  He cannot show an obvious error under our existing cases interpreting the Hobbs Act.  That Act requires the government to prove that Daniels's "robbery" "affect[ed] commerce" in some way.  18 U.S.C. § 1951(a).  It also defines "commerce" to include not just interstate commerce but also "all other commerce over which the United States has jurisdiction."  *Id.* § 1951(b)(3).  The Supreme Court has held that this "unmistakably broad" definition extends the Hobbs Act to reach all conduct that Congress may constitutionally regulate under its commerce power.  *Taylor v. United States*, 579 U.S. 301, 305 (2016).  That power gives Congress the ability to regulate intrastate economic activity (such as the sale of illegal drugs) if that activity "substantially affect[s] interstate commerce *in the aggregate*."  *Id.* at 306 (emphasis added); *see also Gonzales v. Raich*, 545 U.S. 1, 22 (2005).  So Congress may regulate an individual occurrence of this general economic activity (such as a *single* intrastate drug sale) even if this occurrence's "individual impact on interstate commerce is minimal."  *Taylor*, 579 U.S. at 306; *see United States v. Sanders*, 2021 WL 4787226, at *3 (6th Cir. Oct. 14, 2021).

Applying the Supreme Court's broad reading, we have repeatedly stated that the Hobbs Act requires the government to prove only a "*de minimis* connection with interstate commerce" when a defendant robs a business establishment (as compared to an individual).  *United States v. Watkins*, 509 F.3d 277, 280 (6th Cir. 2007); *see Sanders*, 2021 WL 4787226, at *3.  We have added that the Act does not require the government to prove that such a business robbery had "an actual effect on interstate commerce[.]"  *United States v. Peete*, 919 F.2d 1168, 1174 (6th Cir. 1990); *see United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016); *Watkins*, 509 F.3d at 281; *United States v. Wang*, 222 F.3d 234, 237 (6th Cir. 2000).  Rather, the government need only establish a "realistic probability" that this type of robbery would have this effect.  *Wang*, 222 F.3d at 237 (citation omitted).  This probability exists when, for example, the business regularly purchased out-of-state goods and the robbery might affect these purchases.  *See id.*; *see also Sanders*, 2021 WL 4787226, at *3 (collecting examples).

Evaluated against this caselaw, the district court did not commit an obvious error.  *See Olano*, 507 U.S. at 734.  When discussing the commerce element, its instructions suggested that "[a]ny effect at all on commerce is enough."  Instructions, R.63, PageID 224.  They then

clarified that a robbery could satisfy this element if a robber "obtain[ed] money that belonged to a business which customarily purchased goods from outside the State of Ohio . . . if [the robber's] conduct made that money unavailable to the business for the purchase of goods or the conducting of business." *Id.* The court lastly gave the challenged instruction: "It is not necessary for you to find that there was an actual effect on interstate commerce." *Id.* Our cases say almost the same thing word for word. As one decision noted, the government does not need "to prove that a Hobbs Act robbery had an actual effect on interstate commerce, but only that there was a 'realistic probability' of such an effect." *Watkins*, 509 F.3d at 281 (quoting *Peete*, 919 F.2d at 1174).

Daniels responds by pointing to the commentary in our pattern jury instructions. This commentary suggests that, unlike an *attempted* Hobbs Act robbery, a *completed* Hobbs Act robbery "requires an actual effect on interstate commerce." Sixth Cir. Pattern Jury Instruction 17.03 cmt. (May 1, 2025) (citing *United States v. DiCarlantonio*, 870 F.2d 1058, 1061 (6th Cir. 1989)). In the decision that this commentary cites (*DiCarlantonio*), we held that an extortion defendant's conduct did not violate the Hobbs Act because the defendant had received FBI-supplied bribe money from the extorted business. *See* 870 F.2d at 1059–61. We held that the government could not rely on this money for the commerce element because it did not belong to a business engaged in commerce. *See id.* When reaching this conclusion, we opined that "a substantive Hobbs Act violation requires an actual effect on interstate commerce[.]" *Id.* at 1061. We added, by contrast, that the receipt of this money could prove that the defendant committed an *inchoate* crime like attempt or conspiracy. *See id.*; *see also Peete*, 919 F.2d at 1175.

True, Daniels identifies an inconsistency in our cases: *DiCarlantonio* suggested that the Hobbs Act "requires an actual effect," 870 F.2d at 1061, while others have said that the Act "does not require . . . an actual effect," *Watkins*, 509 F.3d at 281. But the district court reasonably sided with our latter decisions. Among other reasons, the Supreme Court has explained after *DiCarlantonio* that the government need not prove "that the defendant's conduct *in and of itself* affected . . . commerce" if the "category of conduct" in the aggregate does. *Taylor*, 579 U.S. at 309 (emphasis added). And unlike the extortion in *DiCarlantonio* (which took *government* funds), the robbery in this case took an *interstate business's* money and goods.

Ultimately, though, we need not reconcile this inconsistency. The inconsistency itself forecloses Daniels's claim on plain-error review. *See Olano*, 507 U.S. at 734.

Daniels fares no better with his related argument that the jury instructions had the effect of constructively amending his indictment. He points out that the indictment charged him with a completed Hobbs Act robbery (that affected commerce), but the instructions suggested that the jury could find him guilty of an attempt offense (that did not affect commerce). He is right that a constructive amendment can occur if jury instructions charge a different crime than the one alleged in the indictment. *See United States v. Davis*, 970 F.3d 650, 659 (6th Cir. 2020). But he is wrong that the instructions did so here (at least under plain-error review). As we have explained, at least some of our cases have not required proof that a completed offense actually affected interstate commerce. Under that broad view, the instructions properly charged the substantive Hobbs Act offense and there was no plain error.

### III. Sentencing Challenges

Daniels next challenges his sentence. He argues that the district court issued a "procedurally unreasonable sentence" because it miscalculated his guidelines range in four ways. *United States v. Riccardi*, 989 F.3d 476, 481 (6th Cir. 2021). But his reasons all lack merit.

### A. Physical-Restraint Enhancement

Daniels first argues that the district court should not have applied a physical-restraint enhancement. The then-applicable robbery guideline told district courts to increase a defendant's offense level by two "if any person was physically restrained to facilitate commission of the offense or to facilitate escape[.]" U.S.S.G. § 2B3.1(b)(4)(B) (2024). This guideline's commentary (which both parties accept) defined "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up." *Id.* § 1B1.1 cmt. n.1(L); *see id.* § 2B3.1 cmt. n.1. Applying this definition, we have repeatedly held that a defendant physically restrains victims if the defendant points a gun at them and orders them "to move from one location to another." *United States v. Coleman*, 664 F.3d 1047, 1049–51 (6th Cir. 2012); *see United States v. McCormick*, 2024 WL 4881041, at *2–3 (6th Cir. Nov. 25, 2024); *United States v. Howell*, 17 F.4th 673, 692 (6th Cir. 2021); *United States v. Montgomery*,

748 F. App'x 668, 672 (6th Cir. 2018); *United States v. Perry*, 743 F. App'x 617, 619 (6th Cir. 2018); *United States v. Smith-Hodges*, 527 F. App'x 354, 356 (6th Cir. 2013). In *Coleman*, for example, we applied this enhancement when a robber ordered a bank employee at gunpoint to walk out of his office and sit on the lobby floor. *See* 664 F.3d at 1048, 1050.

This precedent triggered the enhancement for Daniels. He entered the T-Mobile store and pointed a gun at two employees. He then forced them at gunpoint to walk to the backroom so that he could "get access" to phone and money vaults. *Perry*, 743 F. App'x at 619. In other words, Daniels "limit[ed] [the employees'] freedom of movement by brandishing a firearm and compelling [them] to move from one location to another." *Coleman*, 664 F.3d at 1050. He thus "physically restrained" them under our understanding of that phrase. U.S.S.G. § 2B3.1(b)(4)(B).

In response, Daniels relies on *United States v. Ziesel*, 38 F.4th 512 (6th Cir. 2022). There, an *unarmed* robber told bank tellers to get on the ground without implying that he had a weapon and while assuring them that nobody would get hurt. *Id.* at 514. We held that the robber did not physically restrain these tellers merely by ordering them "to get on the ground" without more. *Id.* at 516. Yet Daniels did more. He had a gun. And he forced the employees to walk from one location to another against their will. So this case resembles *Coleman*, not *Ziesel*.

Daniels retorts that the robber in *Coleman* forced the victims to sit or lie on the floor while he never forced the T-Mobile employees to get down. Yet *Coleman* did not turn on this factual nuance. Rather, it turned on the use of a firearm to force a victim to change locations. *See Coleman*, 664 F.3d at 1050. So we have applied the enhancement when the robber forced a victim "to accompany him to the bank's vault" without requiring the victim to lie down. *Montgomery*, 748 F. App'x at 672; *see Perry*, 743 F. App'x at 619. This rule covers Daniels's conduct.

Daniels also invokes the Second Circuit's narrower reading of "physically restrained," which would not apply this enhancement if armed robbers only forced victims to change locations. *See United States v. Taylor*, 961 F.3d 68, 78–79 (2d Cir. 2020). But our published cases have chosen a "broader" test than the one that the Second Circuit follows. *Smith-Hodges*, 527 F. App'x at 357; *see United States v. Hill*, 963 F.3d 528, 535–36 (6th Cir. 2020). In fact,

this circuit conflict has led the Sentencing Commission to adopt a change to § 2B3.1(b)(4)(B) that follows the Second Circuit's narrower view and requires "physical contact or confinement" for the enhancement.  U.S.S.G. § 2B3.1(b)(4)(B) (2025); *see also* U.S. Sentencing Comm'n, *Sentencing Guidelines for United States Courts*, 90 Fed. Reg. 19798, 19798–99 (May 9, 2025). The Commission has not yet determined whether this change will apply retroactively.  So although we may have to change course down the road, we must follow our current precedent here.

## B. Bodily Injury Enhancement

Daniels next argues that the district court should not have applied a bodily injury enhancement.  The robbery guideline tells district courts to increase a defendant's offense level if "any victim sustained bodily injury" during a robbery.  U.S.S.G. § 2B3.1(b)(3).  The size of the increase depends on the seriousness of the injury.  So a court should increase the offense level by two for a "bodily injury"; by four for a "serious bodily injury"; and by six for a "permanent or life-threatening bodily injury[.]"  *Id.* § 2B3.1(b)(3)(A)–(C) (citation modified).  And if an injury falls between these three extremes (that is, between a bodily injury and a serious bodily injury or between a serious bodily injury and a permanent one), the court can increase the offense level by either three or five.  *See id.* § 2B3.1(b)(3)(D)–(E).

The commentary (which again both parties accept as valid) clarifies that the phrase "[b]odily injury" covers "any significant injury; *e.g.*, an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought."  *Id.* § 1B1.1 cmt. n.1(B); *see id.* § 2B3.1 cmt. n.1.  This reading comports with the ordinary understanding of the phrase: a "[h]urt or loss" to a person's "body" or a "bodily wound or sore." VII *Oxford English Dictionary* 981 (2d ed. 1989) (defining "injury"); II *Oxford English Dictionary*, *supra*, at 353 (defining "bodily").  By comparison, the commentary defines "serious bodily injury" to cover an "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  *Id.* § 1B1.1 cmt. n.1(M); *see id.* § 2B3.1 cmt. n.1.

A few examples show the harms that we have found qualify as "bodily injury." In several cases, victims suffered a bodily injury from the pain caused by a gun strike even though the strike did not leave bruises or other outward signs of harm. *See United States v. Person*, 714 F. App'x 547, 551–52 (6th Cir. 2017); *United States v. Davenport*, 30 F. App'x 338, 339–40 (6th Cir. 2002) (order); *United States v. Jones*, 1999 WL 133262, at *3–4 (6th Cir. Feb. 25, 1999) (per curiam); *United States v. Austin*, 1996 WL 109500, at *11–12 (6th Cir. Mar. 11, 1996) (per curiam); *cf. United States v. Jackson*, 918 F.3d 467, 487 (6th Cir. 2019). In another case, the victim suffered a bodily injury when she bruised her knees and arms after the defendant grabbed her and she jumped out of a car. *See United States v. Carroll*, 1997 WL 588853, at *2 (6th Cir. Sept. 22, 1997) (per curiam). In still another, the victim suffered a bodily injury when the defendant's beating caused abrasions, a hyperextended shoulder, and knee and elbow soreness. *United States v. Muhammad*, 948 F.2d 1449, 1456 (6th Cir. 1991); *see also United States v. Faulkner*, 1999 WL 717960, at *2–3 (6th Cir. Sept. 10, 1999) (cut chin and lip).

The district court found a "bodily injury" here (and so added two points) because of the harm the T-Mobile employees suffered from Daniels's macing. Did their harms suffice? To answer that question, we begin with our standard of review. We review purely legal questions de novo and purely factual questions for clear error. *See United States v. Flores*, 974 F.3d 763, 765 (6th Cir. 2020). But what about the ultimate or mixed question whether the historical facts about the victim's harms rose to the level required to qualify as "bodily injury" under our reading of that guideline phrase? We have suggested that this question remains open in our court. *See id.* But several cases also appear to deferentially review the question for clear error. *See Jackson*, 918 F.3d at 487; *Person*, 714 F. App'x at 552; *Muhammad*, 948 F.2d at 1456; *United States v. Fitzwater*, 896 F.2d 1009, 1012 (6th Cir. 1990). We need not decide on the answer here because we would uphold the district court's conclusion under any standard.

The T-Mobile employees suffered a "painful and obvious" injury when Daniels maced them. U.S.S.G. § 1B1.1 cmt. n.1(B). One employee testified that Daniels sprayed her "directly in the face" with the mace. Trial Tr., R.116, PageID 740–41. The spray made her face feel like it "was on fire." *Id.*, PageID 741. She tried to put water in her eyes, but the water did not help. *Id.*, PageID 731–32. Paramedics later arrived and treated the other employee by pouring "saline"

into her eyes. *Id.*, PageID 741. But the testifying employee did not like people "touching [her] eyes" so she had to stand outside in the cold to get relief. *Id.*, PageID 731–32, 741. The mace caused her pain into the night and "didn't stop hurting until [she] fell asleep." *Id.*, PageID 741. These harms exceed (or at least match) those that we have held suffice when robbers have hit a victim's head or body with a gun. *See Person*, 714 F. App'x at 551–52; *Davenport*, 30 F. App'x at 339–40; *Jones*, 1999 WL 133262, at *4; *Austin*, 1996 WL 109500, at *11–12.

Related caselaw supports this conclusion. We, for example, have held that pepper spray qualifies as a "dangerous weapon" under a different guideline enhancement because it can cause "extreme pain" and impair bodily organs. *United States v. Melton*, 233 F. App'x 545, 547 (6th Cir. 2007) (discussing U.S.S.G. § 2B3.1(b)(2)(E)). Similarly, we have held that a state pepper-spray conviction can qualify as a "crime of violence" under a now-defunct guideline provision because pepper spray (a "self-defense" tool) is "*designed* to cause intense pain." *United States v. Mosley*, 635 F.3d 859, 861–62 (6th Cir. 2011) (citation omitted). These holdings reaffirm that Daniels's victims suffered a "painful and obvious" injury when he sprayed mace directly in their faces. U.S.S.G. § 1B1.1 cmt. n.1(B).

Other circuit courts have reached similar results. The Ninth Circuit applied the enhancement when a victim suffered a "burning sensation" from pepper spray and sought treatment from paramedics. *United States v. Alisic*, 357 F. App'x 778, 780 (9th Cir. 2009) (memorandum). The Tenth Circuit applied the enhancement when the victim suffered pain for "at least 'several hours'" after a macing. *United States v. King*, 2000 WL 1114248, at *3 (10th Cir. Aug. 8, 2000) (order). And the Seventh Circuit applied the enhancement when the defendant's use of mace caused the victim's eyes to burn so much that she could not wear contacts. *See United States v. Maiden*, 606 F.3d 337, 340 (7th Cir. 2010); *see also United States v. Robinson*, 20 F.3d 270, 278 (7th Cir. 1994). The harms from Daniels's use of mace resemble these harms.

Daniels responds by invoking the Fourth Circuit's decision in *United States v. Lancaster*, 6 F.3d 208 (4th Cir. 1993) (per curiam). There, the defendant maced a security guard to escape from an armed-truck robbery. *See id.* at 209. The guard felt "severe burning in his eyes and cheeks," but the mace caused no "lasting health problems." *Id.* On these facts, the Fourth

Circuit upheld the district court's decision not to apply the bodily injury enhancement. *Id.* It reasoned that the guard had suffered "only momentary" pain that "lasted minutes, not hours." *Id.* at 210–11. Yet *Lancaster* does Daniels no good. As the Third Circuit has explained, all these "macing" cases show that this enhancement depends on "a factually specific inquiry" into the harm each victim suffered. *United States v. Harris*, 44 F.3d 1206, 1218 (3d Cir. 1995); *see Robinson*, 20 F.3d at 278–79. And like in the cases that have applied the enhancement, one of Daniels's victims suffered harm that lasted for hours, not minutes. So her harm qualified as a bodily injury.

## C. Criminal-History Score

Daniels lastly challenges the district court's criminal-history calculations. The court found that Daniels had six criminal-history points, which placed him in Criminal History Category III. He argues that the court used two ineligible sentences to calculate these points: a prior § 924(c) sentence from 2007 and a prior reckless-driving sentence from 2019.

### 1. Prior § 924(c) Conviction

a. According to Daniels's presentence report, he served as a lookout for an armed robbery of a Kroger in 2004. During this robbery, his accomplices brandished weapons and took over $13,000. Daniels later pleaded guilty to two counts: conspiring to commit Hobbs Act robbery (in violation of 18 U.S.C. § 1951(a)) and using or carrying a firearm during or relating to a crime of violence (in violation of 18 U.S.C. § 924(c)(1)). In 2007, the district court sentenced Daniels to 72 months' imprisonment: 12 months for the Hobbs Act conspiracy and 60 months for the § 924(c) offense. *See United States v. Daniels*, 2023 WL 5725406, at *2 (S.D. Ohio Sept. 5, 2023).

Significant legal events have happened since then. At the time of Daniels's sentence, we had held that his conviction for conspiracy to commit Hobbs Act robbery qualified as a "crime of violence" and thus could support his § 924(c) conviction for using or carrying a firearm during such a crime. *See United States v. Taylor*, 176 F.3d 331, 337–38 (6th Cir. 1999). But the Supreme Court then found part of § 924(c) unconstitutional in *United States v. Davis*, 588 U.S. 445, 470 (2019). In response to *Davis*, we held that a Hobbs Act conspiracy no longer counted

as a "crime of violence" under § 924(c). *See Wallace v. United States*, 43 F.4th 595, 601 (6th Cir. 2022).

This intervening precedent showed that Daniels's prior § 924(c) conviction likely rested on a mistake: that his Hobbs Act conviction could serve as the "crime of violence." In 2023, Daniels moved to vacate his § 924(c) conviction under 28 U.S.C. § 2255. *See Daniels*, 2023 WL 5725406, at *2. But prisoners can seek this relief only if they remain in custody. *See In re Stansell*, 828 F.3d 412, 416 (6th Cir. 2016). And Daniels had completed his sentence (including supervised release) when he filed the motion. *See Maleng v. Cook*, 490 U.S. 488, 491–92 (1989) (per curiam).

Daniels's prior § 924(c) conviction thus remained on the books when the district court sentenced him in this case. This conviction implicated both statutory and guidelines provisions about the proper sentence he should receive for his three current offenses (another § 924 conviction, another Hobbs Act conviction, and a felon-in-possession conviction). Starting with the statute: Daniels's prior § 924(c) conviction triggered a mandatory minimum 25-year sentence for his current § 924(c) conviction. *See* 18 U.S.C. § 924(c)(1)(C)(i). If he did not have any prior § 924(c) convictions, by contrast, his mandatory minimum sentence would drop to 7 years. *See id.* § 924(c)(1)(A)(ii). The district court recognized that Daniels's prior § 924(c) conviction remained valid at sentencing. Still, the court refused to impose the 25-year minimum that this conviction should have triggered for Daniels's current § 924(c) conviction. It instead imposed the shorter 7-year minimum.

Turning to the guidelines: they instructed the district court to "[a]dd 3 points" to his criminal-history score for any "prior sentence of imprisonment exceeding one year and one month." U.S.S.G. § 4A1.1(a). Daniels received no points for his prior (still valid) Hobbs Act conviction because the district court had sentenced him to only 12 months on this count. But the district court imposed three points for his prior § 924(c) conviction. That decision bumped Daniels into Criminal History Category III. When combined with a total offense level of 26, this category triggered a guidelines range of 78 to 97 months for Daniels's Hobbs Act and felon-in-possession convictions. Yet his range would have decreased to 70 to 87 months if Daniels had

fallen into Criminal History Category II.  The district court ultimately imposed a 97-month sentence for these two convictions.

Both sides appealed.  The government appealed the district court's refusal to impose the 25-year statutory minimum.  And Daniels appealed the use of his § 924(c) conviction in his criminal-history score.  Meanwhile, the district court that had sentenced Daniels in his 2007 case granted him a writ of error *coram nobis* and vacated the prior § 924(c) conviction.  *See United States v. Daniels*, 2024 WL 3939083, at *6 (S.D. Ohio Aug. 26, 2024).  The government thus opted to dismiss its appeal in this case.  So we need only consider Daniels's appeal.

b. Daniels raises two claims—one legal, the other discretionary.  *First*, Daniels argues that the district court committed an error of law by imposing criminal-history points for his prior § 924(c) conviction because the Supreme Court's *Davis* decision left no doubt that the conviction was unconstitutional.  This claim misunderstands the law.  We and the Sentencing Commission both recognize that a defendant generally may not turn a sentencing hearing into a collateral attack of a prior conviction used to enhance the defendant's guidelines range.  The Commission has explained that defendants may not use the "current sentencing proceeding" to relitigate a prior conviction.  U.S.S.G. § 4A1.2 cmt. n.6.  So district courts may refrain from counting an allegedly invalid conviction only if the conviction has *already* "been reversed or vacated" or "ruled constitutionally invalid in a prior case" at the time of sentencing.  *Id.*  Likewise, we have repeatedly rejected a defendant's efforts to avoid a sentencing enhancement based on the claim that a prior conviction undergirding the enhancement violated the law in some way.  *See United States v. Aguilar-Diaz*, 626 F.3d 265, 269–71 (6th Cir. 2010); *United States v. Lalonde*, 509 F.3d 750, 767–68 (6th Cir. 2007); *United States v. Bonds*, 48 F.3d 184, 186–87 (6th Cir. 1995).

Under this law, the district court properly included Daniels's prior § 924(c) conviction in his criminal-history score.  At the time of Daniels's sentencing, no court had "reversed or vacated" his prior § 924(c) conviction or found it "constitutionally invalid in a prior case[.]"  U.S.S.G. § 4A1.2 cmt. n.6.  Instead, Daniels sought to relitigate the validity of this prior conviction in the "sentencing proceeding" itself.  *Id.*  But he could not collaterally attack his sentence in this way.  *See Aguilar-Diaz*, 626 F.3d at 270.  And although the district court later vacated Daniels's prior § 924(c) conviction in the *coram nobis* proceeding, this later-in-time

event does nothing to show "on direct appeal" that the district court committed a mistake of law at sentencing. *United States v. Farley*, 23 F. App'x 235, 237–38 (6th Cir. 2001) (per curiam).

In response, Daniels invokes the Commission's statement that the district court may disregard a prior conviction ruled "constitutionally invalid in a prior case[.]" U.S.S.G. § 4A1.2 cmt. n.6. He argues that our *general* decisions recognizing that Hobbs Act conspiracy cannot support a § 924(c) conviction qualify as "prior case[s]" that found his conviction "constitutionally invalid" before his sentencing. *Id.* Relying on a Seventh Circuit decision, he adds that he need not point to a *specific* decision overturning his *own* conviction to satisfy this prior-case requirement. *See United States v. Jenkins*, 772 F.3d 1092, 1098 (7th Cir. 2014). But our precedent has rejected this approach. Even when we have believed that a prior conviction was "invalid," we have still counted it under the guidelines because no court had invalidated it, unless the conviction violated the defendant's right to counsel. *Lalonde*, 509 F.3d at 768. And the Seventh Circuit's contrary logic would broadly open up prior convictions to "collateral attacks" during sentencing. *Aguilar-Diaz*, 626 F.3d at 270. That court suggested that general precedent can permit collateral attacks if the precedent unambiguously applies to the defendant's conviction too. *See Jenkins*, 772 F.3d at 1097–98. But defendants will always claim that the precedent on which they rely covers them. So when is it too much of a leap to allow for this type of collateral attack? And when is it not? The Seventh Circuit did not say. We instead read the sentencing guidelines as requiring a defendant to identify an order overruling the defendant's own conviction. Because Daniels did not have such an order here at the time of his sentencing, the district court correctly applied three criminal-history points for his prior § 924(c) conviction.

*Second*, Daniels asks us to remand for resentencing as a discretionary matter even if the district court committed no legal error. A federal statute governing our review suggests that we "may . . . vacate, set aside or reverse any judgment . . . of a court lawfully brought before [us] for review, and may . . . require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106. This text grants appellate courts "broad discretion" to remand for resentencing when appropriate. *United States v. Grant*, 15 F.4th 452, 459 (6th Cir. 2021) (quoting *United States v. Campbell*, 168 F.3d 263, 265 (6th Cir. 1999)). We, for example, have remanded to promote "judicial efficiency" when a sentencing amendment that would apply

to a defendant has gone into effect after the defendant has appealed. *United States v. Ralston*, 110 F.4th 909, 924 (6th Cir. 2024) (citation omitted); *see United States v. Martinez*, 137 F.4th 858, 862 (3d Cir. 2025); *United States v. Claybron*, 88 F.4th 1226, 1230–31 (7th Cir. 2023); *cf. United States v. Gonzalez-Valencia*, 133 F.4th 1072, 1078 (D.C. Cir. 2025).

As relevant here, we have also remanded for resentencing when a defendant obtained an order overturning a prior conviction after the district court had used the conviction in its guidelines calculations at sentencing. *See Farley*, 23 F. App'x at 236–38. In *Farley*, the district court counted the defendant's state conviction when determining her criminal-history score. *Id.* at 236–37. While the case remained pending on appeal, the defendant obtained a state-court order overturning this conviction. *Id.* at 237. We recognized that the district court committed no error when relying on this prior conviction. *Id.* at 238. But we still remanded for resentencing as a discretionary matter. *Id.* (citing *United States v. Cox*, 245 F.3d 126, 131 (2d Cir. 2001)).

Even still, we decline to remand here for two reasons. Reason One: The district court recognized the potential invalidity of Daniels's prior § 924(c) conviction at sentencing. Indeed, it granted Daniels a big benefit (of debatable legality) based on its prediction that this conviction would get overturned. Specifically, the court refused to impose a statutorily required 25-year minimum sentence that this prior § 924(c) conviction would have triggered. *See* 18 U.S.C. § 924(c)(1)(C)(i). By instead imposing a 7-year minimum, the district court shaved off 18 years from Daniels's sentence. Unlike the district court in *Farley*, then, the district court here treated the then-valid § 924(c) conviction as effectively invalid from the start. *Cf.* 23 F. App'x at 236–38.

So why did the court add the three criminal-history points based on this prior § 924(c) conviction? The court compromised: It chose to award Daniels the big benefit (by relying on a 7-year minimum rather than a 25-year minimum), but not this smaller one. The court's choice modestly increased his guidelines range (the top of his range increased by less than a year from 87 months to 97 months). And it imposed this modestly harsher sentence because of the need to deter Daniels from future robberies. In fact, the court "want[ed] to give [Daniels] 25 years for" his prior robbery and believed Daniels "deserve[d]" that sentence. Sent. Tr., R.102, PageID 534.

But it felt like it could not issue the broader punishment given "the state of the case law as it is[.]" *Id.*

Reason Two: The parties do not dispute that Daniels and his accomplices completed a robbery of a Kroger. So a completed robbery undergirds his prior conviction for conspiring to commit Hobbs Act robbery. And if the government had charged Daniels with aiding and abetting this robbery (rather than with conspiring to commit it), his prior Hobbs Act conviction would have still qualified as a "crime of violence" under § 924(c). *See United States v. Richardson*, 948 F.3d 733, 741–42 (6th Cir. 2020). In that scenario, he likely would have received the 25-year mandatory-minimum sentence. In addition, the district court imposed a 12-month sentence for Daniels's prior Hobbs Act conviction—just a month and a day shorter than required for this (still-valid) conviction to trigger its own criminal-history points. *See* U.S.S.G. § 4A1.1(a). Yet the court likely imposed that short 12-month sentence because it had to impose a consecutive 60-month sentence for the now-invalid § 924(c) count. If it had known that the § 924(c) conviction was invalid, it may well have imposed a longer sentence for the Hobbs Act conviction (and rendered it eligible for the same criminal-history points). *See Dean v. United States*, 581 U.S. 62, 67–69 (2017). All these technicalities mean that the guidelines range would not take Daniels's prior robbery into account *at all*. But the district court refused to put blinders on to this dangerous robbery. It reasoned that the precedent finding § 924(c) unconstitutional did not "erase" this crime. Sent. Tr., R.102, PageID 534. It thus considered it when choosing its sentence.

For both reasons, we have no doubt that the district court would have imposed the same sentence in any resentencing. And we would not promote "judicial efficiency" by remanding for a foregone conclusion. *Ralston*, 110 F.4th at 924 (citation omitted). We thus decline to do so.

### 2. Prior State Conviction

Daniels lastly challenges the district court's decision to give him one criminal-history point for an Ohio "reckless" operation conviction in 2019. The district court counted this conviction because it found as a fact that the state court had convicted Daniels "for driving while

intoxicated[.]" Sent. Tr., R.102, PageID 524. Daniels claims that the court erred by looking at the actual conduct that supported his reckless-operation conviction.

Under U.S.S.G. § 4A1.2, district courts should exclude some misdemeanor convictions from a defendant's criminal-history score. *United States v. Rollins*, 378 F.3d 535, 537 (6th Cir. 2004). They should exclude (among others) "[c]areless or reckless driving" convictions except in certain circumstances. U.S.S.G. § 4A1.2(c)(1). At the same time, the commentary tells courts to "always" count "[c]onvictions for driving while intoxicated or under the influence (and similar offenses by whatever name they are known) . . . without regard to how the offense is classified." *Id.* § 4A1.2 cmt. n.5. The district court here counted Daniels's reckless-operation conviction because (even though it was presumptively excluded) Daniels had committed it by driving drunk.

The parties now debate whether the court had the power to consider the actual conduct underlying Daniels's conviction. According to Daniels, the district court should have followed the "categorical approach" that considers only the elements of his crime of conviction and not the conduct in which he engaged. *See Mathis v. United States*, 579 U.S. 500, 504 (2016). According to the government, the court properly considered Daniels's actual conduct in this specific setting. *See United States v. Washington*, 103 F.4th 917, 922 (2d Cir. 2024).

We need not resolve this dispute because any error in using this prior conviction would have been harmless. We have regularly found guidelines miscalculations harmless when they do not affect a defendant's ultimate guidelines range. *See, e.g.*, *United States v. Castro*, 960 F.3d 857, 867 (6th Cir. 2020); *United States v. Turner*, 738 F. App'x 856, 865 (6th Cir. 2018); *United States v. Tucker*, 206 F. App'x 459, 464–65 (6th Cir. 2006). This rule applies here. The district court placed Daniels in Criminal History Category III after calculating his criminal-history score as six. Without the one point for this reckless-operation conviction, Daniels's score would have fallen to five—which would have continued to place him in Criminal History Category III. And Daniels points to no other evidence suggesting that this conviction could have affected the outcome in another way. Even though the government raised this harmless-error argument in its brief, Daniels said nothing about it in his reply.

We affirm.

---

**CONCURRENCE / DISSENT**

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.

I join the majority opinion except its rejection of Daniels's request that we remand for resentencing.

Daniels argues that the district court's reliance on his 18 U.S.C. § 924(c) conviction constituted legal error and, in the alternative, requests that we remand for resentencing as a discretionary matter. At the time of sentencing, Daniels's § 924(c) conviction was still valid. But after sentencing, the district court in the § 924(c) case granted a writ of error *coram nobis* and vacated that conviction. *See United States v. Daniels*, 2024 WL 3939083, at *6 (S.D. Ohio Aug. 26, 2024). I agree with the majority that, because Daniels can point to no order invalidating his § 924(c) conviction at the time of his sentencing, the district court did not commit legal error when it scored three criminal-history points for Daniels's prior § 924(c) conviction. But I would analyze his request for a discretionary remand differently.

Under 28 U.S.C. § 2106, we "may . . . vacate, set aside or reverse any judgment . . . of a court lawfully brought before [us] for review, and may . . . require such further proceedings to be had as may be just under the circumstances." In past cases where a sentence rests on a since-invalidated conviction or guidelines recommendation, we have exercised our discretion to remand for resentencing. *United States v. Farley*, 23 F. App'x 235, 238 (6th Cir. 2001) (remanding where sentence-enhancing conviction was overturned while the appeal was pending and defendant could have sought collateral relief); *United States v. Ralston*, 110 F.4th 909, 924 (6th Cir. 2024) (remanding where a guidelines change while the appeal was pending would have allowed defendant to seek relief under 18 U.S.C. § 3582(c)); *see also United States v. Cox*, 245 F.3d 126, 131 (2d Cir. 2001) (remanding where sentence-enhancing conviction was overturned while the appeal was pending); *United States v. Hoey*, 725 F. App'x 58, 62 (2d Cir. 2018) (same); *United States v. Martinez*, 137 F.4th 858, 862 (3d Cir. 2025) (remanding where a guidelines change while the appeal was pending would have allowed defendant to seek relief

under 18 U.S.C. § 3582(c)).  As Second Circuit explained in *United States v. Cox*, such an approach spares the parties and the courts from expending the resources to litigate and resolve the matter in a subsequent 28 U.S.C. § 2255 petition and is consistent with our preference for resolving claims through direct appeal rather than postconviction proceedings.  245 F.3d at 131.

The majority offers two reasons for its decision not to remand.  I find neither persuasive. First, it contends that the district court recognized the invalidity of the § 924(c) conviction and responded with a compromise, granting Daniels a significant benefit by shaving eighteen years off his sentence, but still using the conviction to increase the top of his guidelines range by ten months.  As the majority notes, the district court's recognition that the § 924(c) conviction was effectively invalid distinguishes this case from *Farley*, where the district court simply found that the prior conviction had not been overturned.  But I fail to see why that distinction should make a difference.  Daniels still received a harsher sentence than the guidelines would otherwise recommend based on a now-invalid conviction, and the resolution of his claim now, rather than through postconviction proceedings, would benefit both the parties and the court.

Second, the majority contends that, based on the facts underlying Daniels now-invalid § 924(c) conviction, he could have been charged with aiding and abetting Hobbs Act robbery rather than conspiracy, which could have resulted in a still-valid conviction for a "crime of violence" under § 924(c), and would make Daniels eligible for the twenty-five-year mandatory-minimum sentence.  I would not hypothesize about what crimes Daniels could have been charged with in a prior case or what conviction may have resulted.  In any case, these considerations do not change the fact that Daniels no longer has a valid § 924(c) conviction, and it would benefit both the parties and the court to consider that development on direct appeal rather than through a future collateral proceeding.

Because Daniels no longer has a prior § 924(c) conviction, and because that fact changes his guidelines range, I would exercise discretion to remand for resentencing.